**SEMCO, INC., an Alabama Corporation, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 716–81C.**

United States Claims Court.

Aug. 22, 1984.

Philip A. Geddes, Decatur, Ala., for plaintiff.

Kathleen A. Flynn, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

WIESE, Judge:

This case is before the court on defendant's motion for summary judgment and plaintiff's opposition thereto. The dispute at issue arises out of a contract between plaintiff, Semco, Inc., an Alabama small business corporation, and the United States Army Missile Materiel Readiness Command (MIRCOM) for the production of 23 electronic subassemblies—one "first article" and 22 production units. After two successive first article submissions had failed to meet specified test requirements, the contract was terminated for default. Plaintiff appealed this default termination to the Armed Services Board of Contract Appeals (the board). However, before the appeal was heard, the contracting officer converted the termination for default to a termination for the convenience of the Government. As a result, the pending board appeal was dismissed by joint stipulation.

The parties then began negotiations to determine the amount due plaintiff in consequence of the convenience termination. However, a settlement could not be reached. Semco insisted it was entitled to compensation for the 22 production units, all of which it had assembled by the termination date, as well as for the two first articles. The contracting officer entered a final determination, in an amount covering only the expenses allocable to assembly of the two first articles, on September 3, 1981. The resulting dispute was then brought here.

In opposing any allowance of plaintiff's claim, the Government argues—based on reasons we take up shortly—that the court is without jurisdiction in the matter and that the claim, therefore, must be dismissed. Alternatively, with regard to the

merits of the controversy, the Government argues that plaintiff's claim is foreclosed by specific contract language that places upon the contractor the risks associated with production costs incurred prior to first article approval.

Plaintiff opposes both of the Government's arguments. It insists the case is properly before this court and, further, that it is entitled to payment for its production unit costs (as part of the convenience termination settlement). As to the last point, the theory for recovery appears to be that the termination was inspired in the first instance by the Government's doubts concerning the validity of its own test procedures rather than by any genuine fault with the contractor's product. And therefore, so the argument continues, the contractor should not be saddled with the costs of units which proper test procedures would show to be in compliance with specifications.

Having considered the briefs of the parties and without oral argument (plaintiff having declined the opportunity for oral argument), the court concludes (i) that the matter is properly before this court for decision, and, (ii) that plaintiff is not entitled to additional compensation in respect of the production units. The court therefore grants the Government's motion for summary judgment.

*Facts*

Plaintiff, Semco, Inc., was awarded contract DAAH01–78–C–0153 for the production of 23 electronic subassemblies (one first article and 22 production units) on November 30, 1977. The first article and the production quantity were procured as separate line items: the contract price for the first article was $5,000.00; the price for the production units was $14,273.60.

Semco submitted a first article for testing on July 13, 1978. During the course of approval testing the unit ceased to function. The Government's test technician and supervising engineer checked the test set-up and test procedures and found them to be in accordance with the specified drawing. They concluded that the unit had suffered a catastrophic component failure. No attempt was made to disassemble the unit to determine which component or components had failed.

By letter of October 2, 1978, the contracting officer notified Semco that the first article was disapproved. The letter went on to request that an additional first article be submitted.[1] Semco protested the disapproval, contending that its first article had passed the required tests prior to submission to the Government, and that the failure had most likely been caused by the Government's use of improper test procedures.

When the disagreement over the disapproval was not resolved in the course of further correspondence, a meeting between officials, including the contracting officer and the test personnel and representatives of Semco's management, was held on November 17, 1978. At the meeting Semco was given the opportunity to question the test technician about the manner in which the first article had been tested. No additional evidence was discovered to suggest that the test had been incorrectly performed by the Government. Nevertheless, it was agreed that a Semco representative could witness the Government's testing of the contractor's next submission.

On January 8, 1979, the second unit (a first article) was tested; the unit failed before testing could be completed. Having observed the test procedure and its results, Semco now stated that it would try to identify and correct the problem. The contracting officer answered in reply that no

---

1. Subsection J–3 of the contract, which governed the submission of the first article for approval testing, allowed the Government 70 days after receipt of the first article within which to conduct testing and to notify the contractor whether the first article was approved, conditionally approved, or disapproved. That section further reserved to the Government the right to require submission of an additional first article if the initial submission were disapproved.

additional work under the contract was authorized.

On February 12, 1979, the Government terminated the contract for default. But, as earlier noted, the contracting officer reversed this action, unilaterally deciding, instead, to terminate the contract for the Government's convenience. To what extent this change in position may have been prompted by the contractor's arguments is not disclosed in the record. Nevertheless, the Government's reversal of position was formalized through a contract modification issued on May 30, 1979, and shortly thereafter the parties agreed to a dismissal of the default termination appeal then pending before the board.

Settlement negotiations were promptly undertaken. However, by the time of the contractor's second cost proposal, which specified the sum due as $23,456.10, an impasse had been reached. Semco was advised this amount was not allowable, *i.e.*, the Government would not pay for labor or material allocable to the production units because the first article had not been approved at the time the contract was terminated. On September 3, 1981, the contracting officer issued a final determination finding the amount due the contractor to be $5,091.78. The decision allocated the costs of three units—the two first articles and one which had been destructively tested—to the terminated portion of the contract. The appeal of the contracting officer's unilateral determination on quantum was brought directly into this court.

## Discussion

### A.

▮ The threshold issue in the case is one of jurisdiction. The Government insists that the court lacks power to entertain plaintiff's claim because, as a matter of timing, the claim falls outside the bounds of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982), and therefore cannot be brought in this court as an original matter, *i.e.*, as a so-called "direct access" claim authorized by section 10 of the Act, 41 U.S.C. § 609(a)(1) (1982).

Consequently, plaintiff's only remedy—the argument continues—is an administrative appeal to the board. Not until that step has been completed would we have jurisdiction, and then appellate only, to consider plaintiff's claim.

The Contract Disputes Act of 1978 grants a contractor the right to "proceed under this Act with respect to any claim pending then [*i.e.*, March 1, 1979, the effective date of the Act] before the contracting officer or initiated thereafter." 41 U.S.C. § 601 note (1982) (Effective Date). As the Government reasons it, plaintiff's claim, though it did not surface, in fact, until well after the controlling date of March 1, 1979, is yet to be viewed as having its origins prior to that time. To reach this result, the Government points to the protections afforded it by the linkage between default and convenience terminations that is recognized in the wording of the contract's default clause. The particular language referred to reads as follows: "[i]f, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default * * * the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause." ASPR § 8–707(e), 32 C.F.R. § 8.707(e) (1976).

Upon the basis of this language, the Government makes the argument that where a convenience termination supplants a default termination, the rights and obligations between the parties shall be the same as if the convenience termination had been there from the start. Taking this in its full literal sense, as the Government does, it means that the convenience termination relates back to the initial default declaration, *i.e.*, February 12, 1979.

The problem with this argument is that it is analytically incomplete. It is one thing to say that, by virtue of the quoted contract language, the date of the convenience termination should relate back to the date

of the original default termination. That seems a fair enough equation to draw in light of the words quoted. However, it is quite another matter to assume, as the Government's argument also does, that the convenience termination and the dispute on quantum that followed thereafter are one and the same. Most definitely they are not.

There has not been, nor is there now, any dispute regarding the Government's right to exercise its contract power of convenience termination. The dispute is on quantum—on the amount due in consequence of the convenience termination—and that issue did not arise until well after the convenience termination had taken place. It is this failure to distinguish between the uncontested exercise of the power to terminate and the amount owing in consequence thereof that leads the Government to the unsupportable premise that plaintiff's rights under the convenience termination clause accrued on February 12, 1979. It was not until the parties had expressed their opposing views on the quantum issue that the makings of a dispute came into view—and that was long after March 1, 1979.

On this same point it is worth noting too that, in the contracting officer's final decision on quantum of September 3, 1981, the contractor was advised that, in regard to the pursuit of subsequent remedies, the matter could be appealed to the board or "[i]n lieu of appealing to the ASBCA, you may file an action in the U.S. Court of Claims within 12 months of your receipt of this decision." This last is the route the contractor chose and it clearly was correct, jurisdictionally speaking, in doing so.

### B.

■ Turning now to the merits of plaintiff's claimed entitlement to compensation for manufacture of the production units, it is plaintiff's position that the Government's motion for summary judgment may not be granted because disputed issues of material fact remain outstanding. Specifically, plaintiff contends that but for some defect in the first article testing by the Government—either as a result of improper application of test procedures or because of defective test specifications—its first article submissions would have been approved by the Government. In turn, approval of the first article would trigger the Government's liability under the termination for convenience clause for the costs incurred by Semco on account of the production articles. Though the contractor's argument avoids saying so, the essence of it appears to be that the court may imply a first article approval and notice thereof to the contractor if, upon trial, the facts were to show that the first article had been improperly rejected.

The Government answers this argument by saying that even if Semco's first article had failed because of improperly applied test procedures or because of defective test specifications (points the Government does not concede) the contract nevertheless gave the Government the right to terminate the contract for its convenience, and, in so doing, to limit its contractual exposure. The Government refers specifically to subsection J–3 of the contract's "Special Conditions" which provided, in part, as follows:

> Prior to approval of the first article, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity shall be at the sole risk of the Contractor, and costs incurred on account thereof shall not be allocable to this contract * * * for the purpose of termination settlements, if this contract is terminated for the convenience of the Government prior to approval of the first article.

In light of the quoted contract language, the Government's position here rests on firm ground: the contract clearly defined the point at which responsibility for production costs would become the Government's burden. And that triggering event—approval of the first article—had not occurred when the contract was terminated.

Plaintiff, however, urges the court to adopt the view that, by terminating the

contract for convenience without having approved the first article, the Government impermissibly shifted to the contractor the risk that the test specifications were defective (in the sense that they exceeded design capabilities) or else had been incorrectly applied.

There is no room for such a position; it proceeds from the erroneous premise that demonstration of a too-stringent test specification or proof of an improperly administered test would alter the rights and duties of the parties as defined by the first article clause. Clearly it would not for the Government was not bound, in the first instance, to proceed with approval testing simply because a first article had been submitted. Nor, for that matter, was the Government bound to give notice of approval, and thereby authorize the commencement of production, even if testing had confirmed the unit's compliance with specification.

The requirement for first article approval is intended to minimize financial risk to both the Government and the contractor. ASPR § 1–1902, 32 C.F.R. § 1.1902 (1976).[2] Where, as plaintiff asserts is the case here, the contract contains test standards more rigorous than the product design can accommodate, then the opportunity to discover that fact before production costs are incurred, and to adjust to it through corrective change or convenience termination, can accomplish significant savings for the Government. Likewise, the limited financial demands that a first article assembly entails for a contractor may also, in a given case, avoid the much larger burden of an unacceptable product and its related production inventory. In recognition of these goals, the contract's first article clause quite unambiguously states that "Prior to approval of the first article, the acquisition of materials or components for, or * * * production of, the balance of the contract quantity shall be at the sole risk of the Contractor * * *".

To adopt plaintiff's view of the matter would be to strip the first article clause of the very benefits it was meant to secure. It would oblige the Government to accept a product built, perhaps, according to specifications yet incapable of meeting the performance parameters expected of it. There is no justification for such a frustration of purpose.

The point is worth keeping in mind that it was not a matter of compulsion that placed the contractor in the position of incurring production-related expenses in advance of first article approval. There were no supplier-dictated minimum purchase quantities that forced purchases beyond the quantity required to meet first article delivery; and neither were there such time constraints in the contract's delivery schedule that production in anticipation of first article approval seemed the less risky path to take. In short, the contractor assumed risk beyond that which the performance of its contract obligations demanded and now seeks to shift that burden onto the Government. There is no good reason, factually or legally, to permit such a result.

## CONCLUSION

For the reasons stated herein, the contractor is not entitled to recover. The Government's motion for summary judgment is granted and the complaint shall be dismissed.

---

**2.** The regulation states: "A requirement for first article approval is designed to assure that the contractor can furnish a product that is satisfactory for its intended use and, therefore, minimizes risks for both the contractor and the Government." ASPR § 1–1902, 32 C.F.R. § 1.1902 (1976).