**NEAL & COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 340–87C.**

United States Claims Court.

July 5, 1989.

As Amended Aug. 1, 1989.

R.R. DeYoung, Anchorage, Alaska, for plaintiff. Wade & DeYoung, of counsel.

J. Keith Burt, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court after trial on the amount of the equitable adjustment due plaintiff. Plaintiff Neal & Company, Inc. ("plaintiff"), and the Army Corps of Engineers (the "Corps") entered into fixed-price contract DACA 85–85–C–0006 dated November 16, 1984, in the amount of $1,680,000.00 for the repair and alteration of two tramways located at the Cape Newenham, Alaska Air Force Station ("AFS"), and Tin City, AFS.

## BACKGROUND

The amended complaint set forth three causes of action. First, plaintiff claims that it had a forward-priced agreement to perform a change order, referred to by the parties as Case 4, to replace the cable for the tramway at Cape Newenham. Defendant denied the existence of any binding agreement, but conceded that plaintiff was entitled to an equitable adjustment for replacement of the tram cable. Plaintiff's second claim is for an equitable adjustment upon a change order, which the parties refer to as Case 16, for repair of a tram car damaged at Cape Newenham following an accident that was the fault of another contractor. As its third claim, known as Case 29, plaintiff seeks damages based on a delay in a progress payment.

According to an audit conducted by the Defense Contract Audit Agency (the "DCAA") dated July 8, 1988, the claim on Case 4 spans from January 1, 1986, through October 15, 1986; the Case 16 work began on August 18, 1985, and continued through November 4, 1985. Plaintiff frames Case 4 at June through October 15, 1986, and Case 16 at October through December 1985 and May 1986. Given these disparities and the fact that defendant does not contend that any one line item should be denied as beyond a claim period, the court has identified line items to defendant's more inclusive time periods. Moreover, because plaintiff presents its Case 4 before Case 16, which itself took place earlier, this opinion follows suit.

On December 19, 1988, defendant moved *in limine* for an order preventing plaintiff from introducing evidence at trial that Case 4 was negotiated on a fixed-price basis and that the only evidence admissible regarding Case 4 should be the increased costs that plaintiff incurred. In a bench ruling on February 17, 1989, the court granted defendant's motion for several reasons. The proposed forward-priced agreement dated November 14, 1985, in the amount of $296,440.00 was negotiated for plaintiff by Craig Watts, one of the two Project Managers assigned to the contract, and for the Corps by its Resident Contracting Officer Patricia S. Opheen. On its face the proposal bore the legend written by Ms. Opheen, "Agreed subject to audit and Contracting Officer approval." It was never

approved. Defendant also had established that Ms. Opheen lacked authority to enter into a binding agreement on behalf of the Corps in excess of $50,000.00. The November 14 proposal also bore the one notation "audit" by the item covering the cost of the cable. This was consistent with plaintiff's assertion that Ms. Opheen represented that the audit was to be restricted to overhead rates and the value of the Swiss franc for the cost of the cable. In granting defendant's motion *in limine*, and thereby requiring plaintiff to prove its increased costs, the court allowed plaintiff to show that any deficiencies in its proof are due to plaintiff's acting on such a representation.

For all practical purposes, trial was confined to the amount of the equitable adjustment due on Cases 4 and 16. Plaintiff offered no evidence that its letter of December 6, 1986, with respect to Case 29 was signed, which had the effect of foreclosing, as a matter of law, recovery for any period beyond September 28, 1987, the date upon which the Corps received a certified claim, signed on behalf of plaintiff, for interest on a delayed progress payment. *See J.M.T. Mach. Co. v. United States*, 826 F.2d 1042, 1045–46 (Fed.Cir.1987). Therefore, on the basis of the record before the court, plaintiff has not established its entitlement to any amount beyond $82.95 that the Corps has paid on this claim.

■ It is plaintiff's position in its revised cost summaries submitted after trial that it was entitled to $328,994.00 for Case 4, of which amount plaintiff asserts that it was able to document $292,999.97. With respect to Case 16, plaintiff claimed $188,038.00 before trial; now it asserts that $119.201.88 has been documented.[1] In its pretrial memorandum defendant took the position that since the Corps had paid plaintiff $250,000.00 (the amount actually was $236,399.00) on account of Case 4 and the

DCAA audit determined that plaintiff could support only $187,166.00, plaintiff has been overpaid $62,834.00, for which defendant counterclaimed.[2] At trial defendant stipulated to additional amounts due on this claim. However, defendant's post-trial response to plaintiff's corrected cost summaries retracted without explanation approximately $30,000.00 of its concession made in its prior submissions and at trial. Regarding Case 16 defendant contended at trial that the Corps has paid plaintiff $23,902.57 and that the DCAA audit revealed that plaintiff could support approximately $71,054.00 in costs, so that plaintiff is entitled to recover approximately $47,151.43.

■ Counsel were advised before trial to consult the discussion on proof of damages in *Skip Kirchdorfer, Inc. v. United States*, 14 Cl.Ct. 594, 605–07 (1988), and they agreed that the legal standards set forth controlled. Although *Skip Kirchdorfer* is a breach of contract case, the law is applicable to plaintiff's claim for an equitable adjustment. *William Green Constr. Co. v. United States*, 201 Ct.Cl. 616, 626, 477 F.2d 930, 936 (1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974); *J.D. Hedin Constr. Co. v. United States*, 171 Ct.Cl. 70, 86, 347 F.2d 235, 246 (1965). The contractor bears the burden of proving the amount of its damages. *Roberts v. United States*, 174 Ct.Cl. 940, 956, 357 F.2d 938, 949 (1966). As stated in *Skip Kirchdorfer*, a contractor in a claim situation is not required to segregate costs attributable to a change order; however, the claimant must present reasonably satisfactory proof of increased costs based on acceptable cost allowance principles or expert testimony, so that the determination of the amount of damages will be more than mere speculation. The hallmark of allowability of any item of increased costs is its reasonableness.

---

1. A contractor can rely on testimony in lieu of documents to prove its damages. However, the court agrees with plaintiff that its testimony alone would not substantiate a claim to any amount beyond the lower figures set forth in plaintiff's post-trial submission.

2. Defendant originally counterclaimed for $13,601.00 on the basis of the contracting officer's final decision. The DCAA subsequently questioned $187,166.00. Defendant moved in its April 19, 1989 pretrial memorandum for leave to amend its counterclaim to reflect the alleged overpayment of $62,834.00. Leave was granted during trial.

The exchange of correspondence between plaintiff's representatives and authorized contracting representatives of the Corps, specifically the January 5, 1987 letter to plaintiff from James R. Volz, Resident Contracting Officer, demonstrates that both plaintiff and the Corps approached Case 4 on the basis that so-called "judgmental" items, such as equipment and labor hours, field supervision, and management expenses, were not subject to audit, but that the factual rates applied to these items were. Mr. Volz wrote: "The judgmental items were negotiated to mutual agreement, leaving the factual items to be verified by audit." The Corps reneged on its commitment to accept the negotiated estimates for judgmental items. Since the Corps was not bound by any contractual imperative other than its word, however, plaintiff has no complaint unless it can prove that its reliance on the Corps' representations caused deficiencies in its proof. Plaintiff, however, knew as early as a Corps letter dated April 16, 1986, that the Corps contemplated a further negotiation and a final modification after receipt of the audit and verification of the cost of the cable.

Plaintiff, on the one side, and the Corps and the DCAA, on the other, were remiss in pursuing the audit. On March 10, 1986, plaintiff submitted its Form 1411 (Contract Proposal Pricing Sheet) audit information to the Corps. In support of the Form 1411 data, plaintiff certified that they were accurate, complete, and correct as of March 7, 1986. However, plaintiff misrepresented that Hamre Bahnson & Associates ("Hamre/Bahnson") had performed substantial work as a subcontractor on Case 4. Taking the position that plaintiff's data were insufficient, the Corps delayed the audit. Then after a tentative start, the DCAA inexplicably put the audit on hold. In fact, by the time the audit was completed on July 8, 1988, it was no longer an accounting tool, but was intended to be a litigation aid. Paul E. Szymula, the DCAA Senior Auditor who performed the audit, wrote a file memorandum dated April 6, 1988, reporting his telephone conversation with the Corps' agency counsel:

Steelman states that ultimate original requester of audit was DOJ. However, the audit should be structured more to defend the Gov't's position rather than determining what is wrong w/the ... [contractor's] proposal. I said that, for instance, I would have a difficult time questioning all ... [subcontractor] costs just because individual tasks were not segregated. He said "in a normal case you'd question it, right[?."].....

Although the parties shared responsibility for the delayed audit, the Government's share was the larger. Yet, the court was unable to find that plaintiff's proof was prejudiced by the delay. The infirmities in plaintiff's showings, to be discussed, were inherent and did not reflect lost or misplaced records, diminished memories, and so forth. Plaintiff's proof was undermined not so much by the difficulty in reassembling the accounting records, invoices, and cancelled checks but, rather, by its relationship with David S. Hamre, variously identified by himself in exhibits as president, secretary/treasurer, and general manager of Hamre/Bahnson, a partnership. Mr. Hamre did not testify; however, the documents of record depict his role in detail, so that the court does not rely unduly on testimony in making findings concerning his activities.

In addition to documentary evidence, plaintiff's proof consisted of testimony of witnesses who performed the extra work, its accountant who sponsored its analysis of line items, and an expert in cost accounting who had reviewed plaintiff's records. Defendant put forth as its defense the DCAA audit, as explained by its auditor. A contractor need not satisfy audit standards in order to recover for a given line item, although an audit is a useful tool at trial in gauging the sufficiency of a claimant's proof. Generally, therefore, the audit was not an alternative damages scenario, but a verification of the reasonableness of those claims of plaintiff that defendant disputed.

## FACTS AND DISCUSSION

Trained as an accountant, Helene Greaves, plaintiff's engineering manager,

testified that Hamre/Bahnson had quoted to do all the work on the basic contract. According to Mrs. Greaves, in order to establish plaintiff's own presence in performing the contract, plaintiff reduced Hamre/Bahnson's proposed role in the project management and electrical work. Plaintiff's excessive dependence on Hamre/Bahnson permeated the case. When witness Wayne Aderhold joined plaintiff as Project Manager in late October 1985, co-managing the contract work with Mr. Watts until the latter left plaintiff's employ in December 1985, Hamre/Bahnson was performing the bulk of the tramway work. After the Corps agreed with plaintiff's recommendation that the track cables at Cape Newenham should be replaced, the project that formed Case 4, Mr. Aderhold insisted that Hamre/Bahnson become involved. Mr. Paul (Tony) Neal III, President of plaintiff, explained that plaintiff could not replace the cable without Mr. Hamre's expertise with tram cable. Mr. Hamre had acquired this expertise through his work on ski lifts.

This contract was Messrs. Neal's and Hamre's first business dealing. When Mr. Neal bid on the basic contract, he knew that he could not do the work without Mr. Hamre's help. However, Mr. Hamre could not obtain a surety bond. At this point Mr. Neal needed Mr. Hamre because plaintiff's bid was based on Mr. Hamre's proposal. Mr. Neal testified that he "had to take control for our protection" and characterized his role as checking Mr. Hamre's material suppliers and auditing his payroll. Mr. Neal renegotiated his subcontract with Hamre/Bahnson to account for his essentially acting as comptroller of the firm. The April 10, 1985 subcontract signed by Mr. Hamre for Hamre/Bahnson and in his individual capacity stipulates that plaintiff shall have the right to audit all payment demands based on quantities at unit prices and that all payments by plaintiff shall be made only with checks paid jointly to Hamre/Bahnson's suppliers. According to Mrs. Greaves, by the end of 1985 Mr. Neal had dissolved plaintiff's subcontractor relationship with Hamre/Bahnson. Mr. Neal testified that by December 1985 plaintiff was paying by audit every cost that Mr. Hamre had incurred. As Mr. Neal explained during his testimony:

It was apparent he really wasn't a subcontractor. What he was, was like a consultant person for his own expertise and ... he couldn't handle money to take care of getting the other work done.

I said, "Gee, look Dave, this is getting you in trouble and me too. It's costing you money, costing me money. You can't—you shouldn't be a subcontractor and I don't want you to be a subcontractor when I'm taking all the risks and paying all the money. Let's change this out. I'll pay you all the costs that you have on this job. I'll pay you your costs and you be a consultant. You get this track cable stuff done for me and I'll pay you, you know, what you're worth, what you need to have and I'll pay the costs. And I'll be the contractor and you be the consultant."

During January and February 1986, plaintiff audited Hamre/Bahnson's books. Mr. Hamre was acting as an employee of plaintiff in connection with preparing for the Case 4 work to commence in the spring. Mr. Neal said that Mr. Hamre wanted to be a consultant. Thus, plaintiff, Hamre/Bahnson, and Mr. Hamre and Reid Bahnson individually entered a July 3, 1986 agreement, relied on by plaintiff as the basis for plaintiff's payments to Mr. Hamre on Case 4 and justification for claiming these amounts against the Corps.

The agreement describes the "relationship" of plaintiff and Hamre/Bahnson on the basic contract, which at that time still included some work in addition to Case 4 track cable replacement. According to the agreement, plaintiff would take over unpaid taxes due the Internal Revenue Service beginning in July 1986, which ultimately amounted to $30,000 allotted to Case 4. Plaintiff agreed to pay the balance of Hamre/Bahnson's workmen's compensation costed and billed to plaintiff. Hamre/Bahnson and Mr. Hamre agreed to release plaintiff for all claims under the contract prior to July 1, 1986. Mr. Hamre agreed to work as a "consultant on the

project" for the months of July and August 1986, with a stipulated consulting fee of $5,000 a month paid bi-monthly. No additional amounts would be paid for Hamre/Bahnson overhead costs. Mr. Hamre maintained an Anchorage office that was needed for expediting material, the costs of which had been paid by plaintiff. Hamre/Bahnson also agreed to assign all right, title, and interest in its boom truck to plaintiff, and plaintiff agreed to assume and pay the remaining payments on the boom truck. Previously on the Case 16 tram repair, Hamre/Bahnson had furnished the boom truck as a subcontractor. As an overall matter, the court finds this agreement is an insufficient predicate upon which to claim against the Corps all monies that plaintiff paid to or on account of Hamre/Bahnson or Mr. Hamre in respect of Case 4 work.

Mr. Aderhold, who managed Case 4 after December 1985, wrote a memorandum to the file reflecting that as of July 21, 1986, plaintiff had completed "the bulk of the work on the tram project" and that it took "much less time" than the November 14, 1985 negotiated price had allowed for. Thus, while plaintiff originally sought to sue on the basis of a negotiated forward-priced agreement for Case 4 in the amount of $296,440.00 (proof of which was rejected by the court's granting of defendant's motion *in limine*), plaintiff sought to substantiate actual costs of $292,999.77 at trial.

Having worked with plaintiff since 1981, Mrs. Greaves was a proficient accounting witness, displaying her knowledge of every aspect of plaintiff's business in project managing, estimating, scheduling, and analyzing costs. She appeared as plaintiff's principal witness in support of the line items for Cases 4 and 16. She described herself as the "quasi-Project Manager" of Case 16.

Mrs. Greaves testified forthrightly that she derived the amount claimed on account of Hamre/Bahnson, as follows: From Mr. Hamre's original proposal to plaintiff, as reduced by subsequent negotiations, she attributed to each line item the revenues flowing to Mr. Hamre, then deleted from the Hamre/Bahnson costs all work not completed by the subcontractor as of December 31, 1985. Thus, the amounts paid to Mr. Hamre were inferred to be for completed work. She calculated the direct costs of the basic contract at $544,300.00; the cost of work not completed by the end of 1985 at $145,383.00; and the cost of completed contract work at $458,755.00. Including a 15 percent allowance for overhead, the difference between completed and uncompleted work was $398,917.00. In addition, plaintiff paid Mr. Hamre $168,-969.00 for change-order work, including $51,383.00 on Case 4 and $68,031.00 on Case 16. The contract changes, including overhead, were listed, as follows:

| | | |
|---|---|---|
| P00001 | Magnetic Inspection | $ 7,454.00 |
| P00003 | Anchor Ropes | 11,909.00 |
| P00005 | Haul Rope | 30,192.00 |
| P00009 P00012 P00019 | Track cable (Case 4) | 51,383.00 * |
| | Tram wreck (Case 16) | 68,031.00 |
| | | $168,969.00 |

\* Revised to $62,148.00 in connection with another exhibit.

The cost, including overhead, of Hamre/Bahnson work as a subcontractor and with Mr. Hamre as consultant on the basic contract and change orders totalled $627,724.00. According to Mrs. Greaves, this amount was paid to Mr. Hamre—identified by code to the basic contract or change orders—and is supported by plaintiff's cancelled checks. Mrs. Greaves had reviewed each check supporting the total figure of $627,724.00 and provided them to the auditor. In another exhibit prepared by Mrs. Greaves, she derived a "Case 4 Total Paid to Hamre" of $62,146.53 by adding all the checks paid to Hamre/Bahnson, the Internal Revenue Service, or Mr. Hamre ($78,903.04) and deducted therefrom all checks for costs paid to Mr. Hamre on Case 16 ($16,756.51), yielding $62,146.53.

Defendant's cross-examination of Mrs. Greaves and Mr. Szymula's direct testimony revealed, however, some doublecounting and misallocation, which plaintiff adjusted for by reducing the amount of its claim on Case 4 for "Labor-costs paid to Hamre for 18004 [Case 4]" *pro tanto* from $62,148.00 to $49,969.00.

In sum, the reconciliation of amounts paid to Mr. Hamre attributable to both

Cases 4 and 16 was derivative. That plaintiff may have paid Mr. Hamre $62,148.00 or $49,969.00 for Case 4 and $68,031.00 for Case 16, however, does not establish the reasonableness of those amounts.

Defendant was able to elicit on cross-examination that plaintiff's coding, some of which was developed by Mr. Hamre, was not used consistently or even accurately to capture costs attributable to Case 4 work in contrast to work under the contract and other change order work. In discussing Case 16, DCAA auditor Szymula also pointed out that plaintiff's Form 1411 summary documentation certified by plaintiff and submitted to the DCAA requested subcontractor overhead in the amount of $26,769.00 and profit in the amount of $10,174.00, at 36.7 percent and 10 percent, respectively. Mr. Hamre apparently formulated these claims. Plaintiff subsequently reduced Mr. Hamre's subcontractor claim from $111,913.00 to $68,031.00. The overhead, including profit and materials, claimed was reduced from $26,769.00 (on Mr. Hamre's base claim of $72,938.00) to $25,356.00 (on plaintiff's base claim of $42,675.00). At trial plaintiff denominated the $25,356.00 as Hamre/Bahnson overhead, profit, and materials, representing an effective rate of 52 percent. Although Mrs. Greaves established that plaintiff's treatment was not inconsistent, as defendant charged, the court has no basis to find that plaintiff sufficiently reduced for Mr. Hamre's inflated claim.

Applying the standard that plaintiff bears the burden of proving the reasonableness of claimed increased costs by a preponderance of evidence does not demand rejection of a claim because a contractor cannot satisfy its burden as to the full amount of the claim. Plaintiff's proof fell short in this respect, but the failure is not fatal to individual line items to the extent either that the claim could be allowed to the point at which plaintiff's proof remained adequate or that the court could reduce the amount claimed in order to account for an inherent defect in proving otherwise reasonable costs. Plaintiff's relationship with Mr. Hamre was of the second order.

I. *Case 4* (Track Cable Change)

a. *Track Cable Materials*, $72,584.00. Defendant has stipulated to amount claimed.

b. *Track Cable Materials Duty Tax*, $3,368.00. Defendant has stipulated to amount claimed.

c. *Miscellaneous Materials*, $3,878.00. Defendant has stipulated to amount claimed.

d. *End Terminals* (wedge type anchor sockets), $2,152.00. Defendant has stipulated to amount claimed.

e. *Master Rigger/Splicer*, $5,500.00. Defendant has stipulated to amount claimed.

f. *Master Rigger Travel Cost*, $2,629.87 —costs incurred by the Master Rigger/Splicer R. Ficker.

Defendant did not object to the per diem charge of this consultant ($500.00 for 11 days), but took the position that because no invoice was submitted for travel from Anchorage to Cape Newenham and return, plaintiff should recover nothing. Plaintiff's Job Cost Report for September 30, 1986, assigns code 18004, the code for Case 4, to a Western Airlines flight in the amount of $1,380.91. Mrs. Greaves testified persuasively that Mr. Ficker's invoice did not include an increment for airfare, a round trip from Palm Springs to Anchorage, plus excess baggage charges, but the additional amount did get coded to Case 4, although she could not find a cancelled check in that amount. She also testified that it is plaintiff's policy to record time to a job on the company's Navajo aircraft. She explained that the journal logging flight information for the aircraft identified the two round trips from Homer (plaintiff's base) to Anchorage to pick up Mr. Ficker and transport him to Cape Newenham, the number of passengers, and the trip dates. For the round trip on July 10, 1986, the clock time is 8 hours (rounded); therefore, at $275.00 per hour, the round trip cost prorated among 3 passengers is $733.33. The return trip on July 19, 1986, from

Homer to Cape Newenham to Anchorage is logged at 5 hours (rounded), although plaintiff claims 7.5 hours. Prorated among 3 passengers at $275.00, the allowable charge is $343.75. The allowable total is $2,457.99.

g/h. *Diener Time and Diener Travel Costs,* $4,815.00—paid to Mr. Diener for magnetic inspection.

After trial plaintiff revised its cost summaries to correspond with plaintiff's proofs at trial. In its response defendant took the position that "the [response reflects] the dollar values supported by competent documentary evidence submitted at trial." Def's Br. filed June 5, 1989, at 1 (footnote omitted). On this basis, although defendant does not stipulate to the amount, the court agrees with defendant that plaintiff's proof was sufficient to establish the claim.

i. *Engineering Services,* $2,807.00—paid to H.E. Rice, an engineering consultant with the firm of Liftram.

Defendant takes the position that plaintiff is able to document entitlement in the amount of $1,070.00, as reflected in a July 1, 1986 invoice by which Mr. Rice billed plaintiff for 23 hours at $40.00 for consulting fees and miscellaneous expenses. Plaintiff relies on a check to Liftram listing an invoice in the amount of $3,860.00. The invoice itself was dated October 6, 1986, for engineering services in July and August in the total amount of $3,860.00, of which $1,737.00, or 45 percent, was prorated to Cape Newenham. Mr. Rice provided a written allocation of his time, and the court finds plaintiff's proof sufficient to support allowing it in the full amount of $2,807.00.

j. *Equipment Costs:*

1. *Boom Truck*—$11,655.00, for the monthly rental of Mr. Hamre's boom truck for 4½ months (June–October 1986) at $2,590.00 per month.

For Case 16 plaintiff claimed $14,470.00 for the boom truck on the basis of $3,960.00 for 3 months, which represented Mr. Hamre's monthly lease payment, plus May 1986 at $2,590.00, which was Hamre/Bahnson's installment purchase price for the boom truck. Of the amount

attributable to Case 4, defendant would concede that the evidence supports $2,572.00.

The testimony of DCAA auditor Szymula compels that plaintiff can recover only the lesser amount. Mr. Szymula, it should be observed, survived a fair amount of auditor-bashing on the basis that he is young (28); has worked six years with DCAA—3 as a Senior Auditor; and his audit of plaintiff, although supervised, was his first audit of a construction contract. Plaintiff's cost accounting expert Darrell J. Oyer, a partner in the Government Contract Services Group of Touche Ross & Co. and a former DCAA Assistant Director of each of Operations, Resources, and Policy Planning, deemed Mr. Szymula's audit quotidian. The court, however, found Mr. Szymula to be thorough, conscientious, and exact.

Mr. Szymula was especially persuasive in sponsoring his boom truck analysis. The equipment was a National Boom Crane Series Truck with a Caterpillar 3208 engine mounted on a Ford LNT 8,000 truck. The basic contract required a boom truck, and Mr. Neal looked to Mr. Hamre to provide it under the Hamre/Bahnson subcontract. Mr. Hamre took a six-month lease from McDonald Industries Alaska, Inc., on the boom truck at $3,960.00 per month, beginning in June 1985 and terminating in November 1985. On November 28, 1985, he signed an agreement to purchase the boom truck at $81,000.00, with monthly payments of $2,590.00 commencing on December 15, 1985. The net paid-in rentals of $19,044.00 were applied to the $81,000.00 purchase price. In December 1985 plaintiff and Hamre/Bahnson dissolved their subcontractor relationship, and in January 1986 Mr. Hamre became an employee/consultant of plaintiff. As part of their July 3, 1986 agreement, plaintiff and Mr. Hamre agreed to transfer title to the boom truck to plaintiff, with plaintiff then assuming responsibility for the unpaid balance. However, title was not transferred until October 29, 1986, after the work had been completed on Case 4.

Mr. Szymula initially was skeptical of this claim because plaintiff's Form 1411

submitted on March 10, 1986, listed Mr. Hamre as a subcontractor on Case 4 and claimed the monthly lease amount of $3,960.00 through October 15, 1986, for a total of $57,420.00. Plaintiff revised this claim before trial to $26,125.00 ($11,655.00 on Case 4 and $14,470.00 on Case 16), to which Mr. Szymula still took exception on the basis that Mr. Hamre should be considered under plaintiff's common control for purposes of 48 C.F.R. ("FAR") § 31.205–36(b)(3) (1987). This regulation disallows reasonable rental costs between entities under common control, which are restricted to ownership costs. The latter in respect of construction equipment are prescribed by FAR § 31.105(d)(2)(i)(A). In the absence of actual cost data, schedules of construction equipment use rates apply. The FAR recognize the Construction Equipment Ownership and Operating Expense Schedule published by the Corps.

Mr. Szymula determined that plaintiff should recover the number of hours recorded from the daily Quality Control Inspection Reports—69 × $37.28—the rate found in the Corps' Construction Equipment Ownership and Operating Expense Schedule, Region IX, for a truck mounted with a hydraulic crane used under severe conditions, for a total of $2,572.00.

Mr. Oyer is correct that the relationship between Hamre/Bahnson and/or Mr. Hamre and plaintiff does not constitute "common control" under the FAR, since plaintiff and Hamre/Bahnson technically were not divisions, subdivisions, subsidiaries, or organizations under common control. Moreover, lease payments need only be reasonable at the time of the lease decision. FAR § 31.205–36(b)(1). Mr. Szymula nonetheless justifiably considered the history of the boom truck in this contract, contrasting plaintiff's original claim of $57,420.00, which asked for 68.4 percent of the total equipment value ($83,927.00) and its revised claim of 31.1 percent ($26,125.00), with the percentages of useful life of the truck and crane used on Cases 4 and 16— 2.2 percent for the truck (129.3 hours over a useful life of 6,000) and 1.0 percent (129.3 hours over a useful life of 13,000). Mr. Szymula's analysis is somewhat overstated

since defendant does not dispute that the boom truck could be removed from the site only in mid-October when the heavy equipment transport barge made one of its biannual trips to Cape Newenham. However, his point is worth noting.

Plaintiff's Case 4 claim for the boom truck covered June to October 15, 1986. During this period Mr. Hamre was an employee to plaintiff (June) and a consultant (after the July 3 agreement). Although plaintiff had the right to take title to the boom truck on July 3, 1986, it did not. The delayed assumption of title until Case 4 work was completed had the effect of having the Corps pay for the truck which plaintiff could have owned for 3½ months. If plaintiff had taken title in July, clearly only an ownership rate would have been available.

Plaintiff has failed to establish that this claim is reasonable. The relationship between plaintiff and Mr. Hamre in respect of Case 4 was opportunistic. The Corps should not be required to finance plaintiff's purchase of the boom truck, even if plaintiff can document that it issued checks to Mr. Hamre covering 4½ months of his installment payments. Plaintiff recouped its payments when title was transferred. The court accepts Mr. Szymula's analysis, including the month of June. The court is not required to retabulate the actual hours worked from July 3–October 15, 1986, to save one month's installment payment of $2,590.00 if plaintiff's claim on the whole is found to be unjustifiably high. Consequently, plaintiff may recover no more than $2,572.00.

2. *Pickup Truck*, $3,152.00. Defendant has stipulated to the amount claimed.

3. *Reel Jack*, $2,400.00. Denying any amount due on this claim, defendant contends a reel jack was purchased under the fixed-price basic contract and the Corps was charged *pro rata* for its use in connection with Case 4. According to Mr. Oyer, a fixed-price contractor is allowed to do so because the contractor becomes the owner of all equipment required to perform a fixed-price contract. Such equipment is not

purchased on account of, or for the benefit of, the Government.

In its post-trial revisions to its cost summaries, plaintiff takes the position that the "one set of reel jacks [was] procured specifically to perform the track cable change...." Plf's Rev. Br. filed June 5, 1989, at 3. Two reel jacks were invoiced by Superior Tramway Co., on April 9, 1985, 6 months before the November 14, 1985 negotiation forming the basis of plaintiff's claim that the Corps had agreed to a forward-priced agreement for Case 4. Plaintiff had been performing under the basic contract since 1984. Mrs. Greaves testified that the invoice specifically covered the purchase of one reel jack to change the track cable. The record substantiates that the parties discussed this extra work during the early performance of the basic contract. Mr. Neal characterized the Case 4 work as a recognized problem from the inception of the contract. The testimony is sufficient to establish that one of the reel jacks was purchased for Case 4. Consistent with the notion of advance purchase, the record also reflects that speciality items, such as the cable per P00007, Part 1 for $80,000.00, were expedited in late 1985 and early 1986 for the anticipated, but yet unapproved, change order work on Case 4 in spring/summer of 1986.

The item also is recoverable even if it could be found that plaintiff purchased the set of reel jacks under the fixed-price contract. Although the court ruled during trial that plaintiff would not be allowed to increase its claims because defendant could not be prepared to defend against new theories of augmentation at trial, Mr. Szymula's objection to this item was that it had been purchased and expensed under the primary contract. Defendant did not dispute Mrs. Greaves' reliance on Mr. Hamre's calculation of a certain number of expected uses of the reel jack. Mrs. Greaves testified that the reel jack actually was used only once at Cape Newenham in connection with Case 4 work and that plaintiff has not been able to use it again in 3 years. This was a specialized assembly that plaintiff in its business would not ex-

pect to use normally. Mrs. Greaves' testimony adequately establishes entitlement to $4,500.00.

4. *Specialty Rigging Equipment,* $1,921.00. Defendant denies this claim in full on the basis that the items had been purchased under the fixed-price basic contract. The items were invoiced under the description "Rigging Gear—Tension/detension Kit—1987", in the total amount of $8,369.86.

Testimony corroborated that these items were used for Case 4 work. Mr. Hamre provided Mr. Aderhold with a written opinion that the "many high wear items" obtained in the kit likely would be used no more than 5 times and have "very little use outside of the trams currently under repair," assigning a one-unit charge for their use at Cape Newenham "to compensate for using ... [the kit] on the tram wreck." Mrs. Greaves relied on this opinion to assign a one-unit charge of $1,673.97 as well to Case 4, which was reasonable. Mr. Oyer's expert testimony, coupled with common sense, is sufficient to establish the proposition that plaintiff is permitted to charge use of such equipment against the Corps for extra work even though the kit itself was acquired under a fixed-price contract for related work and expensed.

In its post-trial revised submission, plaintiff also claimed $247.17, citing documentary support to PX–7, p. 238, which does not exist. Mrs. Greaves' testimony does not supply justification for the additional $247.17 claimed, which is rejected. $1,673.97 is allowed.

k. *Transportation,* $10,000.00—to and from Cape Newenham for employees involved in the Case 4 effort. Mrs. Greaves testified in support of this amount, which the DCAA audit, and defendant at trial, rejected *in toto* because the flight log for the company Navajo did not identify any particular flights applicable to the Case 4 job code 18004. Mrs. Greaves testified that the only work other than Case 4 under the basic contract remaining to be performed in 1986 was painting and tensioning. Plaintiff's other witnesses testified similarly. However, Mr. Szymula's audit of time

cards had determined that during 1986 the total number of hours recorded to job code 18004 were 15–17 percent of the total labor hours expended either at Cape Newenham or Tin City on the total contract effort.

From May 7, 1986, through July 19, 1986, Case 4 work was performed on site. The logs disclosed that 33 passengers were on board and total clock time was 58 hours, at a cost per clock hour of $275.00, a unit charge explained by Mrs. Greaves. The total was $15,900.00. Travel cost for R. Ficker, the Master Rigger/Splicer, was deducted in the amount of $1,228.00, leaving a balance of $14,722.00. A further deduction of $3,866.64 was made for painting (4 men × 2 trips at $483.33 per trip). This amount was deducted from $14,722.00, yielding $10,855.36. Since this claim was the product of a derivative analysis, the amount should stand at $10,000.00. Mrs. Greaves also took the position that the reasonableness of the claim could have been tested by comparing the cost with commercial flights, which would have exceeded $10,000.00. Further, she asserted that Mr. Szymula could have performed the same analysis or verified her approach. He chose not to, looking instead for invoices specific to the Case 4 work. Plaintiff's proof, through Mrs. Greaves' testimony and plaintiff's contemporaneous records, sufficiently establishes plaintiff's entitlement to $10,000.00.

*l. Labor,* $79,992.00. $49,969.00 represents costs paid to Mr. Hamre for work coded to Case 4, including the specific code 18004. The claim includes the following items:

| | |
|---|---|
| General Foreman | $ 4,359.00 |
| Supervision | 1,957.00 |
| Trade labor | 16,732.00 |
| Costs coded to 14101—mobe | 6,975.00 |
| Costs paid to Hamre for 18004 | 49,969.00 |
| | $79,992.00 |

Defendant takes the position that plaintiff is entitled to a maximum of $20,430.00. The discrepancy is attributable to different methodologies. Plaintiff, through Mrs. Greaves, looked to plaintiff's payouts, principally those to Hamre/Bahnson or Mr. Hamre, in order to reconcile all amounts paid by plaintiff to Case 4 and other contract and extra work. Defendant tabulated recorded hours. This case, like *Skip Kirchdorfer,* manifested two trial approaches to ascertaining damages. Defendant's approach is disfavored because it holds plaintiff to a strict audit standard, requiring segregation of all costs claimed to the additional work. A contractor need not satisfy a DCAA audit as a prerequisite to a finding that the amount claimed is reasonable. Therefore, the court deems Mr. Szymula's approach unreasonable in allowing the claim only to the extent that time cards from the period April 27, 1986, through August 23, 1986, record work assigned to code 18004, with an allowance for expediting and site mobilization and demobilization charges.

Plaintiff and Mr. Hamre, on his own, developed codes, several of which are reflective of work on Case 4, including expediting, mobilization, and demobilization. Mr. Neal and Project Manager Aderhold established that cost coding is difficult in a project like Case 4, due to the remoteness of the site. Although the Project Manager tries to help the employees code correctly, time cards do not arrive back at plaintiff's home base in Homer for several weeks. The time cards, coupled with the job reports, reveal that the work was not all coded specifically to code 18004 during the time that the Case 4 cable change work was being performed. That said, however, plaintiff's reconciliation approach is not sufficiently reliable. One deficit is that although the amounts paid to Hamre/Bahnson or Mr. Hamre may have been required to keep Mr. Hamre on the job, that does not mean that they were reasonable. As Mr. Aderhold's file memorandum of July 21, 1986, when he was concerned that the Corps would insist on renegotiating the change order, disclosed, "[a]lthough we're not completely finished with the change, the bulk of the work has been done and we did take much less time than our negotiated price allowed for." Mr. Hamre's consultancy at $5,000.00 per month began in July. Although Case 4 required significant preparatory efforts, it is noteworthy that plaintiff and Mr. Hamre viewed his consulting activities on Case 4 as beginning in the

month when Mr. Aderhold deemed the overall effort as substantially completed.

Mr. Oyer was of the view that approximately $50,000 for the type of expertise provided by Mr. Hamre on Case 4 was reasonable. This testimony is not persuasive in the absence of some expertise of Mr. Oyer in evaluating Mr. Hamre's own expertise in repairing tram cables.

Matters were further complicated by the state of the documentary evidence. Plaintiff offered in support of its proof all of the documents provided to Mr. Szymula, including copies of checks with invoice numbers, copies of invoices themselves, and reconcilation data. Defendant offered as an exhibit all of Mr. Szymula's workpapers, including his analyses of time cards and so forth. However, only those documents discussed with witnesses or argued by counsel were admitted into evidence. The court excluded documents that would have been incomprehensible absent testimony as to their import. The court is not required to trace every invoice to a check or match the weekly payrolls to time cards to verify plaintiff's claim. Rather, the court is to evaluate the sufficiency of plaintiff's proof for each line item.

In this case plaintiff's claim is discounted in the amount of $25,000.00, reflecting the court's dissatisfaction with plaintiff's reconcilation approach, which is nothing more than a method for capturing every dollar that plaintiff claims that it paid out on the contract during the relevant period. In discussing plaintiff's presentation of the amounts claimed for both Case 4 and 16 on account of Mr. Hamre, problems have been identified with the inflated Form 1411 data and plaintiff's methodology for reconciliation. The court is not convinced by Mrs. Greaves' testimony and PX–66A and DX–70 that plaintiff's latest revisions of the amounts claimed sufficiently account for the doublecounting and miscoding identified by Mr. Szymula. Although Mr. Szymula's analysis of Time Tickets coded to 18004 is too exacting in the circumstances, it is a valuable yardstick to measure the reasonableness of plaintiff's claim. Ac-

cordingly, the claim will be allowed in the amount of $54,992.00.

m. *Site Support,* $4,012.00. Mrs. Greaves testified in support of the calculation, which differed from Mr. Szymula's principally in that the former determined that 1,014.8 hours, or 118 days, were attributable to the Case 4 track cable change and Mr. Szymula's recorded hours to code 18004 totalled 496.25.

There is no dispute as to the charge of $34.00 per day to be borne by the Corps per manday on site in respect of the labor charges. The court is convinced based on the testimony of plaintiff's on-site personnel that the overriding activity on the contract during the relevant period was for Case 4, but that the personnel did not always record their time to Case 4. Moreover, Mr. Szymula's allocation of a certain amount of mobilization and demobilization based on total hours to Case 4 has the same drawback.

Defendant takes the position that plaintiff's documentary evidence established its claim in the amount of $3,162.00 as against plaintiff's claim for $4,012.00. It is appropriate to split the difference since plaintiff's method on the whole is reasonable, and Mr. Szymula's is useful, but too strict. Moreover, the amount of decrease should be low in that plaintiff failed to include 17 mandays of site support incurred by Mr. Ficker (the Master Rigger/Splicer) and Mr. Diener (the Magnetic Inspector), as acknowledged by Mr. Szymula in his adjusted allowance of 93 mandays. Plaintiff is entitled to $3,587.00.

n. *Labor Burden,* $20,915.00. Defendant stipulated to the rate claimed of 19 percent for management personnel and 73.-36 percent for field personnel.

Once again, the parties present stark contrasts, in that defendant's labor burden is predicated on its recalculation of the amount of time expended in the labor classifications of trade labor, foremen, and supervisors. The court has rejected defendant's approach as too strict and accepted plaintiff's proof as reasonable. The court has reduced the amount of plaintiff's labor claim, based to a substantial extent on the

amounts paid to Hamre/Bahnson or Mr. Hamre. However, Mr. Hamre's hours were not included in the labor burden. Therefore, the labor burden as calculated by plaintiff will be reduced in a *pro rata* amount of $3,000.00 reflective of the court's reduction in the labor claim not attributable to Hamre/Bahnson, yielding a labor burden of $17,915.00.

o. *Contractor Overhead*, $31,684.44. Defendant has stipulated to the rate claimed of 13.67 percent. Based on the total of contractor work of $195,953.96, the overhead is $26,786.91.

p. *Profit*, $26,346.53. Defendant has stipulated to the rate claimed of 10 percent. On a subtotal of $222,740.87, the profit is $22,274.09.

q. *Bond*, $3,187.93. Defendant has stipulated to the rate claimed of 1.1 percent. On a subtotal of $245,014.95, the bond is $2,695.16.

Plaintiff is entitled to an equitable adjustment for Case 4 in the amount of $247,710.12. Since defendant has paid plaintiff $236,399.00 on account of Case 4, plaintiff shall recover $11,311.12.

II. *Case 16* (Tram Wreck)

a. *Supervision*, $5,361.00—of which the DCAA, and hence defendant, question $592.00 on the basis that 7 of the hours charged to the Case 16 job code 18012 during the week of December 14, 1985, were actually in support of site demobilization and not applicable to Case 16. All 8 hours charged to this job code during the week of November 2, 1985, according to Mr. Szymula, were for boom truck and pickup truck repair, which was inapplicable to Case 16. Due to this perceived discrepancy, defendant has calculated a deduction of $592.00, based on the number of hours multiplied by the cost of the respective labor hours. The time cards and plaintiff's testimony through Messrs. Watt and Aderhold, who co-managed the project, and James F. Barker, Jr., who supervised plaintiff's painting crew at Cape Newenham, established that the hours attributable to demobilization are includable as Case 16 work, as are the hours relating to boom and pickup truck repair. This claim will be allowed in full.

b. *Management*, $3,922.00—for the salary of plaintiff's Project Manager. Defendant disputes the entire amount on the basis that Mr. Watts was a salaried employee under contract to provide all management services required in order to accomplish plaintiff's contract efforts at both Cape Newenham and Tin City. Defendant's position is that since plaintiff did not pay Mr. Watts on a per-hour basis, plaintiff did not incur any additional expense due to Mr. Watts' expending effort on Case 16. Mr. Szymula does not dispute the hours attributed to the Case 16 job code 18012, and Mr. Watts himself testified as to his activities in support of the tram repair. Mr. Oyer convincingly explained that plaintiff is entitled to the management efficiency of Mr. Watts and, on this basis, that it did incur extra expense due to Mr. Watts' work on Case 16. It was Mr. Oyer's opinion that consistent with sound cost accounting principles, every contract task should bear its *pro rata* share. Absent the tram wreck, plaintiff could have used Mr. Watts in support of other contract efforts, even efforts on other contracts. This option was foreclosed to plaintiff due to the time Mr. Watts was required to devote to the tram wreck. Thus, the claim will be allowed in full.

c. *Administration*, $33.00. Defendant takes the position that the documentary evidence adequately supports this claim.

d. *Engineering*, $3,069.00. Defendant denies any amount due.

Liftram's $3,068.32 statement for services dated January 2, 1986, was supported by Mr. Rice's written statement and the testimony of Mr. Aderhold, who co-managed the project with Mr. Watts. Mr. Aderhold testified that Mr. Rice billed 48 hours at $40.00 per hour for the tram wreck, or $1,920.00, which was added to Mr. Rice's charges for round-trip airfare, lodging, and miscellaneous expenses of $1,148.32, for a total of $3,068.32. Mr. Szymula was troubled by another statement from Mr. Rice also dated January 2, 1986, reiterating his

$1,920.00 "estimate" for his work on the tram wreck. Mr. Rice added:

> When Craig and I went to Cape Romanzof and Cape Newenham, we agreed that we would simply make a straight trade-off on time and expenses, so nothing is billed for that whole trip. I did, however, include that time in my estimate for the RCA wreck [Case 16] so you can hopefully get reimbursed from the Corps/Air Force/RCA or somebody.
>
> For your convenience, I have enclosed another letter written more specifically for your use with the Corp., which does not ramble on as this one does.

Defendant's objection is that there is no evidence that plaintiff paid Mr. Rice the amount claimed.

Mr. Aderhold explained the components of the $3,086.32 amount attributable to Case 16. Plaintiff submitted two checks made out to Liftram in the total amount of $10,443.76. Mr. Aderhold identified the itemization in the supporting Liftram invoices attributable to Case 16 in the amount of $3,068.32. Therefore, plaintiff has offered reasonable proof that it incurred this expense in connection with Mr. Rice's efforts on Case 16, and the claim will be allowed in the amount of $3,068.32.

e. *Travel*, $4,933.00. Defendant takes the position that the documentary evidence supports $1.00 less. The total record support is in the amount of $4,932.50.

f. *Labor/Expediting*, $3,332.00. Defendant takes the position that the documentary evidence adequately supports this claim.

g. *Freight & Materials*, $2,019.00. Defendant has stipulated to amount claimed.

h. *Living Expense*, $4,355.00. Defendant has stipulated to amount claimed.

i. *Change Order Preparation*, $3,938.00. Defendant has stipulated to amount claimed.

j. *Subcontractor Costs:*

1. *Direct Labor*, $10,133.00. Hamre/Bahnson was the subcontractor. Defendant takes the position that $8,687.00 has been adequately documented.

Plaintiff offered a series of photographs that depicted the work site and to some extent the working conditions at Cape Newenham. Mr. Barker, supervisor of the painting crew at Cape Newenham, testified about the work which was scheduled to be completed in 1985 that was interrupted due to the tram wreck. Mr. Watts also described the nature of the work required to repair the tram and the working conditions during the project. The testimony of these witnesses supports a finding that the working conditions were severe. Mr. Szymula took no exception to the total hours worked on Cape Newenham, but questioned plaintiff's recording it consistently as overtime, which had the effect of pricing work under the contract as straight time and Case 16 work as overtime, even if it had been experienced differently.

The Time Tickets listed by plaintiff in support of this claim confirm that Mr. Szymula's objections are well taken. Once a substantial error of this magnitude has been identified in plaintiff's proof, it is not the court's responsibility to ascertain whether Mr. Szymula's recomputation is accurate. Accordingly, the claim will be allowed in the amount of $8,687.00. Defendant's analysis is accepted save for the questioning of the 12 hours assigned to demobilization. Testimony established that mobilization or demobilization occurred throughout performance of the Case 16 work, not only at its inception and completion. Accordingly, the claim is allowed to the extent of 242 straight-time hours and 66 overtime hours at the respective rates ($26.98 and $37.32), for a total of $8,992.28.

2. *Equipment:*

(a) *Boom Truck*, $14,470.00—of which defendant would allow $11,360.00. Plaintiff's claim reflects a lease rate of $3,960.00 for three months in Cape Newenham, plus the month of May 1986, when due to the tram wreck painting was resumed, at the installment payment rate of $2,590.00.

Defendant's approach is that the time cards reflect that the boom truck was used a total of 60.3 hours from August 18, 1985, through November 4, 1985. Multiplied at the ownership rate of $37.72 discussed in

connection with the boom truck claim for Case 4, defendant would allow a total of $2,275.00. Mr. Szymula then determined for the next 34 weeks—November 4, 1985, through June 30, 1986—that the boom truck was in a standby status. He assigned a per-hour rate of $6.68 × 40 hours for the 34–week period, for a total of $9,085.00.

The claim will be allowed insofar as plaintiff established that lease payments from October through December 1985 were in the amount of $3,960.00. Mr. Hamre was a *bona fide* subcontractor into December 1985.

In May 1986 Mr. Hamre was an employee/consultant of plaintiff, and plaintiff had no ownership rights in the boom truck. Because Mr. Hamre signed a purchase agreement for the boom truck in December 1985, he became an owner; however, the court has determined that plaintiff is not limited to Mr. Hamre's normal costs of ownership for May 1986, since plaintiff and Hamre/Bahnson or Mr. Hamre cannot be considered under common control. *See* FAR § 31.205–36(b)(3). The claim will be allowed in full.

(b) *Fuel for Boom Truck*, $2,558.00. Defendant would disallow this claim *in toto*.

Originally, the DCAA auditor and Corps questioned $900.00 of this amount. At trial Mr. Szymula's position was that fuel for the boom truck was included in the ownership rates. This approach has been rejected, and the documentary evidence sufficiently establishes the full amount of the claim.

(c) *Pickup Truck*, $1,849.00. Mr. Szymula took the position that only $913.00 was substantiated based on an analysis of the Quality Control Inspection Reports showing that the pickup was only in service for 74.3 hours.

Originally, Mr. Hamre submitted an inflated claim of 40 hours a week for 9 weeks at a rate of $12.29 per hour for a total of $4,424.40. (In addition, he calculated standby based on a 40–hour week × 34 weeks at $1.20 per hour, for a total of $1,632.00, as discussed below.) Mrs.

Greaves reduced the claim substantially based on an average use of 3 hours a day × 50 days from September 9, 1985, through November 4, 1985, at $10.33 an hour, for a total of $1,549.50. She added for the same period 5 hours per day standby at $1.20 an hour, for a total of $300.00. The total claim in the amount of $1,849.50 is justified. Mr. Szymula failed to account for standby. Therefore, Mrs. Greaves' analysis is the more reasonable and will be accepted.

(d) *Standby Pickup*, $1,634.00. Defendant would allow $1,632.00. Plaintiff made a typographical error, and the claim will be allowed in the amount of $1,632.00.

(e) *Rigging Gear*, $1,674.00. Defendant failed to address this claim in its response to plaintiff's cost summaries. However, at trial defendant took vigorous exception to this item on the basis that this equipment had been purchased by Hamre/Bahnson under the basic contract. As Mr. Oyer testified, it is appropriate to make a charge of equipment applied to extra work when the equipment has been purchased for use under a fixed-price contract. Mr. Hamre assigned a life expectancy of 5 jobs to the rigging gear. Mrs. Greaves concurred on the basis that the tension/detension kit is consummable and high wear. Plaintiff has shown sufficient documentary and lay opinion evidence to support this claim in the amount of $1,674.00.

3. *Equipment Transportation*, $521.00. Defendant has stipulated to amount claimed.

4. *Loss Of Efficiency*, $8,142.00. Defendant takes the position that this item should be disallowed *in toto*.

Messrs. Watts and Barker established in detail how the tram wreck impacted the efficiency in the painting of the tramways under the basic contract. Mr. Barker testified that the painting was anticipated to be completed in 1985, had the tram wreck not occurred, and that it was only due to the tram wreck that plaintiff was required to come back and complete the painting in 1986. Mr. Barker also testified persuasively as to how the tram wreck impacted

plaintiff's performance on the painting that it was able to accomplish in 1985. For example, no tram car was available to haul water for the high-pressure washing that had to be performed prior to painting. Mr. Barker was required to drive up a roadway that was located a distance from each tram tower and drag over a hose to perform the washing operation.

Although there is no question that the tram wreck caused a lack of efficiency, the problem is that Mrs. Greaves based her opinion on a written analysis by Mr. Hamre. He took the total labor cost during the period August 20, 1985, through November 4, 1985, of $27,950.57, from which he subtracted $11,665.67, the labor cost attributable to the tram wreck during that period. The difference was $16,-284.90, to which he assigned a 50 percent inefficiency factor, yielding an amount of $8,142.45. His opinion, in pertinent part, reads, as follows:

> The basis of this calculation is our assertion that we lost 50% of our efficiency in performing contract work during this time period. The reason for this was that the RCA tram wreck forced us to perform our contract work mostly in October under wet, wintry conditions. We would have otherwise been able to complete our contract by September 20 in much better weather.

This opinion is not consistent with Mr. Barker's testimony, since the latter did not specify September, but, rather, calendar year 1985. Mr. Barker's testimony was convincing that the tram wreck pushed the painting into 1986, when it could have been completed in 1985 but for the tram wreck. Accordingly, there was evidence of inefficiency, but no basis to quantify it beyond a nominal amount. The claim will be allowed in the amount of $2,000.00.

5. *Overhead,* $15,040.02—using the 36.7 percent rate sponsored by Mr. Hamre. Defendant contends plaintiff should recover nothing for subcontractor overhead.

Mr. Szymula took the position that Mr. Hamre told him that plaintiff did not pay these items (overhead, unabsorbed overhead, and profit), nor did it ever have inten-

tion to do so. Plaintiff produced checks to Hamre/Bahnson inclusive of the amount claimed. Mr. Hamre's calculation of overhead, given that his calculation of all costs assigned to the contract in 1985 was shown to be inflated, does not credibly support the reasonableness of his calculated 36.7 percent rate. The court adopts the combined overhead and profit rates used for the contractor on Cases 4 and 16—23.67 percent. The allowable overhead is $7,975.91.

6. *Labor Burden on Subcontract,* $4,254.00. The parties have stipulated to the rate claimed of 23.28 percent, calculated on the basis of direct labor and loss of efficiency. The court has reduced the allowable amount of these claims to $8,992.28 and $2,000.00, respectively. The rate of 23.28 percent yields a labor burden of $2,559.00.

k. *Labor Burden,* $3,059.00. Defendant has stipulated to the rate of 18.44 percent and not objected to any items (supervision, management, administration, labor/expediting, change order preparation) comprising the total to which this percentage is applied. The claim will be allowed in the amount of $3,058.46.

l. *Overhead,* $12,890.27. Defendant has stipulated to the rate claimed of 13.67 percent. The amount based on a subtotal of $78,250.47 is $10,696.84.

m. *Profit,* $10,718.63. Defendant has stipulated to the rate claimed of 10 percent. The amount based on a subtotal of $88,-947.31 is $8,894.73.

n. *Bond,* $1,296.95. Defendant has stipulated to the rate claimed of 1.1 percent. The amount based on a subtotal of $97,842.04 is $1,076.26.

Plaintiff is entitled to an equitable adjustment of $98,918.30 for Case 16. Since plaintiff was paid $23,902.57 pursuant to the contracting officer's December 23, 1987 final decision, plaintiff shall recover $75,-015.73.

## CONCLUSION

It is found and concluded that plaintiff has supported an equitable adjustment of $346,628.42 for its first (Case 4) and second

(Case 16) causes of action, of which the Corps has paid plaintiff $260,301.57. Plaintiff is entitled to recover for Case 4 the amount of $11,311.12 and for Case 16 the amount of $75,015.73 for a total amount of $86,326.85 pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 611 (1982), from December 10, 1986, in respect of Case 4 and from March 5, 1986, in respect of Case 16. Defendant's counterclaim as to Case 4 shall be dismissed. Plaintiff is not entitled to recover on its third (Case 29) cause of action, and the amended complaint is to be dismissed as to that cause of action. The Clerk of the Court shall enter judgment accordingly.

No costs.