WHITE BUFFALO CONSTRUCTION,
INC., an Oregon corporation,
Plaintiff,

v.

THE UNITED STATES, Defendant.

No. 98–767C.

United States Court of Federal Claims.

Feb. 22, 2002.

Richard E. Alexander, Portland, Oregon, attorney of record for plaintiff.

Michael F. Kiely, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. David M. Cohen, Director, and Todd M. Hughes, Assistant Director.

John Munson, U.S. Department of Agriculture, of counsel.

## OPINION

FUTEY, Judge.

This contract case is before the court following a trial on damages. Plaintiff asserts a claim for approximately $1,662,591 [1] for costs related to its contract with defendant that was originally terminated for default. The parties later agreed to convert the default into a termination for convenience. Plaintiff alleges it is entitled to compensation for numerous costs related to its work on this contract. Defendant challenges most of plaintiff's claims asserting that the proposed costs are either unallowable or unsubstantiated. Defendant believes the court should only award plaintiff $90,932 in full settlement of the termination.

### Factual Background

Plaintiff, White Buffalo Construction, Inc., is a company incorporated under the laws of the State of Oregon. Plaintiff is owned by Luther Clevenger. His wife, Julie Clevenger, assists in plaintiff's financial matters and other job-related tasks. Mrs. Clevenger also owns Rimrock, Inc., which often provides machinery for plaintiff's work. Defendant, the United States of America, is acting by and through its agent the United States Department of Agriculture, United States Forest Service, Willamette National Forest. On June 1, 1988, defendant awarded plaintiff Contract No. 50–04R4–8–7740 (Contract) to construct a handicap-accessible visitor facility at the Salt Creek Falls Viewpoint in the Willamette National Forest, approximately 65 miles southeast of Eugene, Oregon. This was a fixed-price contract with an original price of $531,496. Subsequent unilateral modifications increased the amount to $577,160.84.[2] The notice to proceed was issued June 15, 1988, with performance to begin July 18, 1988, and originally lasting 451 days. The completion date, as modified, was November 23, 1989.

---

1. This amount is an approximation because plaintiff's request varies depending on which standard rates for equipment costs it applies.

2. Plaintiff asserts the court should raise the contract price to $681,347.27 to adequately reflect the cost of these modifications.

The Contracting Officer (CO), Maurica A. Owen, terminated the Contract on November 24, 1989, alleging that plaintiff was in default for not completing the contract work within the specified performance period. Plaintiff received notice of this termination on November 27, 1989. Plaintiff's takeover insurer Transamerica, which later changed its name to Transamerica Insurance Group (TIG), oversaw the completion of the contract work by the replacement contractor, J & C Enterprises (J & C). J & C finished the work in March of 1992.

On November 29, 1989, plaintiff timely appealed the termination for default to the Department of Agriculture Board of Contract Appeals (AGBCA), in Appeal No. 90–133–1. At the same time, plaintiff submitted three claims to the CO seeking reimbursement for: (1) the CO's denial of plaintiff's request to remove equipment from the work site during a fire closure; (2) plaintiff's overhead for government caused delays and changes; and (3) 300 calendar days of additional contract time. The CO denied these claims in their entirety on January 22, 1990. Plaintiff appealed this decision to the AGBCA on April 11, 1990, and the case was docketed as Appeal No. 90–178–1.

The AGBCA consolidated plaintiff's challenges to the termination for default (Appeal No. 90–133–1) and the CO's denial of the three specified claims (Appeal No. 90–178–1). The AGBCA affirmed the CO's conclusions in a decision dated July 28, 1993. *White Buffalo Constr., Inc.*, AGBCA Nos. 90–133–1 and 90–178–1, 1993 WL 291401. Plaintiff timely appealed this decision to the United States Court of Appeals for the Federal Circuit (Federal Circuit) on October 22, 1993, in case No. 94–1041. On or about January 30, 1995, the issue of liability was settled in an agreement converting the termination for default into one for the convenience of the govern-

ment. The parties stipulated to the dismissal of the appeal, with prejudice, and an order approving the settlement was entered by the Federal Circuit on February 3, 1995.[3]

On or about February 1, 1996, plaintiff submitted a settlement proposal using the inventory method of accounting in the amount of $694,990.63. Government auditors, however, recommended that the CO use a total cost method when evaluating the claim. Plaintiff then submitted a revised settlement proposal on May 18, 1997, in the amount of $2,000,175 using the total cost approach.[4] The Defense Contract Audit Agency (DCAA) audited plaintiff's revised proposal on June 18—19, and July 8, 1997. The DCAA submitted its report to the CO on or about July 30, 1997.

After several failed attempts to reach a mutually agreeable settlement amount, the negotiations between the parties stalled. Subsequently, the CO issued a unilateral determination of settlement costs on October 7, 1997, in the amount of $135,776. Prior to receiving this amount, plaintiff had billed defendant for $383,244.24 and had collected $353,299.44 in progress payments. Plaintiff filed a complaint with this court on October 1, 1998, challenging the CO's decision and seeking additional compensation for: (1) pre-termination equipment costs; (2) post-termination equipment costs; (3) materials left on the project site; (4) pre-termination payroll; (5) post-termination payroll; (6) post-termination general and administrative (G & A) expenses; and (7) expenses of the takeover insurer. The amounts plaintiff sought totaled $1,595,548.66. Plaintiff also requested a declaration stating that the contract price does not limit the amount of defendant's liability where fair compensation to the contractor would exceed the original contract

---

3. Two other appeals arose from the Contract, one to the AGBCA and one initially to this court. AGBCA Appeal No. 92–199–1, 1994 WL 481408 involved plaintiff's claim for payment, denied by the CO, for work on stairs. This appeal came to the AGBCA through a transfer order dated June 10, 1992, from this court for Case No. 91–1128C. Plaintiff initially filed suit in this court on August 21, 1991. Another appeal, AGBCA No. 93–113–1, is from a deduction in excess administrative

costs by defendant from retained unpaid earnings otherwise due plaintiff following the default termination. In an opinion dated August 30, 1994, AGBCA Administrative Judge Sean Doherty denied Appeal No. 92–199–1 and sustained Appeal No. 93–113–1.

4. Plaintiff's Exhibits (Pl.'s Ex.) 6.

price.[5] Defendant submitted its answer on January 7, 1999. The court conducted a trial May 29—31, 2001, in Portland, Oregon. During trial, plaintiff amended its complaint to: (1) decrease the amount it sought for materials left on site; (2) add a claim for pre-termination G & A expenses; (3) include a claim to compensate for an arbitrary deduction made by the CO in her calculations; (4) delete its claim for G & A expenses in excess of what the CO awarded; and (5) increase the alleged expenses of its takeover insurer. Plaintiff also requested a 10% profit on all amounts the court awards. Post-trial briefing was completed on August 24, 2001.

## Discussion

### I. The Contract Amount

The threshold issue in this case is whether the court may award plaintiff damages in an amount that exceeds the contract price. Plaintiff seeks a declaration from the court stating that the contract price does not limit the amount of defendant's liability when fair compensation to plaintiff, including all settlement costs, would exceed the price of the original contract terminated for convenience. Plaintiff admits in its post-trial briefing, however, that the total of the pre-termination costs and payments previously made cannot exceed the contract price.[6] Plaintiff nevertheless emphasizes that there is no limitation on what it can recover for post-termination costs.

◼ When a fixed-price contract is terminated for convenience, it is essentially converted into a cost reimbursement contract. *Best Foam Fabricators, Inc. v. United States*, 38 Fed.Cl. 627, 638 (1997) (citing *Anlagen—und Sanierungstechnik GmbH*, ASBCA No. 37,878, 91–3 B.C.A. ¶ 24,128 at

120,753, 1991 WL 133253; *Seven Science Industries*, ASBCA No. 23,337, 80–2 B.C.A. ¶ 14,518 at 71,555, 1980 WL 2875; *Caskel Forge, Inc.*, ASBCA No. 7638, 1962 B.C.A. ¶ 3318 at 17,108, 1962 WL 573). According to the FAR, plaintiff is therefore "entitled to recover all allowable costs incurred in the performance of the terminated work, a reasonable profit on the work done, and certain additional costs associated with the termination." *Id.* (citing 48 C.F.R. § 52.249–2 (1993)). Which costs are allowed is determined by the cost principles set forth in FAR part 31, "subject to the general principle that the contractor should be compensated fairly for the work terminated." *Id.* (citing 48 C.F.R. §§ 49.113, 52.249–2(h), 49.201(a)).[7] The FAR specifically restricts, however, the amount plaintiff may receive when a fixed-price contract is terminated for convenience:

> The total amount payable to the contractor for a settlement, before deducting disposal or other credits and exclusive of settlement costs, *must not exceed the contract price less payments otherwise made or to be made under the contract.*

48 C.F.R. § 49.207 (2001) (emphasis added); *see also* 48 C.F.R. § 52.249–2(f) (2001).

◼ The FAR clearly establishes, therefore, that plaintiff's total settlement award may not exceed the contract price less payments already received. *Id.* Plaintiff may also recover compensation for the reasonable costs related to settlement, which are not subject to this limitation. *Id.* All of plaintiff's pre-termination costs are restricted by this cap. The alleged post-termination claims plaintiff presents also fall under this limitation unless they are costs related to settlement,[8] as described in FAR § 52.249–

5. Plaintiff also requests the right to file within 30 days after entry of final judgment a petition for attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994 & Supp. 2001) and 5 U.S.C. § 504 (1994 & Supp.2001).

6. Plaintiff's Posthearing Brief (Pl.'s Br.) at 30–31.

7. The following factors are considered when determining allowability: (1) reasonableness; (2) allocability to the contract; (3) generally accepted accounting principles and practices; (4) the terms of the contract; and (5) any specific limita-

tions set forth in FAR part 31. *Best Foam Fabricators*, 38 Fed.Cl. at 638 (citing 48 C.F.R. § 31.201–2(a) (1993)).

8. To hold otherwise would threaten the spirit and purpose of the FAR. A terminated contractor who was not restricted by the contract price in this way could purposefully "run up" post-termination costs as a way of "getting back" at the government. The government could face paying the contractor amounts far in excess of the original contract price. Such an outcome would deter the government from rightfully terminating

2(g)(3).[9]

The parties disagree, however, on the actual price of the Contract. The price was originally $531,496, as set forth in the Contract.[10] Defendant maintains that modifications raised the price to $577,160.84, which was the amount the CO used in her Final Contracting Officer's Decision. Plaintiff agrees that at the time of termination the contract price was $577,160.84.[11] Plaintiff argues, however, that the price needs to be increased to $681,347.27 [12] to adequately reflect the cost of Unilateral Modifications 17 and 5.

Unilateral Modification 17 involved the height of a restroom building located on the construction site. Defendant concluded this building was not constructed to the correct height, so it deducted $2,153 to compensate for the time and materials needed to tear out the work and redo it.[13] Plaintiff maintains the facility was built in accordance with the height shown on the construction plans. Plaintiff therefore requests the $2,153 be added back to the contract price.

Plaintiff has provided no evidence besides the self-serving testimony of Mr. Clevenger to prove that the restroom facility was originally constructed to the height set forth in the specified plans, thus making its reconstruction unnecessary. It is plaintiff who bears the burden of proof in this case for establishing termination for convenience

damages. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed.Cir.1987); *Bath Iron Works Corp. v. United States*, 34 Fed.Cl. 218, 231 (1995), *aff'd*, 98 F.3d 1357, 1996 WL 520886 (Fed.Cir.1996). Since plaintiff has not submitted evidence such as the construction plans or proof of the height of the structure as first built, the court must conclude that defendant's decision to deduct $2,153 was reasonable. *See McDonnell Douglas Corp. v. United States*, 50 Fed.Cl. 311, 318 (2001) (finding the Navy's unilateral modification establishing a new schedule to be reasonable). The contract price should not be adjusted to negate defendant's $2,153 deduction.

Plaintiff also challenges Unilateral Modification 5 involving the transport of borrow.[14] Plaintiff characterizes this issue as follows:

> The inspector who had designed the project said that borrow had to be hauled in, and so several days later I met with the COR, and he said that it was an incidental item to the excavation, that we had to haul in borrow. So after several days of discussing it and reviewing the specifications, I met with him again and showed him where it wasn't an incidental item, and so we then tried to negotiate a price. And their initial offer was to pay me $1.25 for borrow [per cubic yard], and I asked for

contracts for default or convenience, even when said termination is in the best interests of the government and the general public.

9. The court notes plaintiff's request in its complaint for declaratory relief stating that the contract price does not limit the amount of recovery for a termination for convenience settlement. As just discussed, the contract price does indeed limit the amount plaintiff may receive, exclusive of the costs related to settlement. Plaintiff's request for a declaration is therefore denied. Moreover, in the absence of an express grant of jurisdiction from Congress, the court does not have the authority to issue such a declaratory judgment. *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). *See also Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir.1997); *Buesing v. United States*, 42 Fed.Cl. 679, 692 (1999); *Betz v. United States*, 40 Fed.Cl. 286 (1998); *Talbot v. United States*, 40 Fed.Cl. 801 (1998).

10. Pl.'s Ex. 1.

11. Pl.'s Ex. 140.

12. Pl.'s Br. at 31. Mr. Clevenger claimed at trial that the contract price was $800,000. Transcript of Trial held May 29–31, 2001(Tr.) at 186, 212. In its post-trial briefing and in Plaintiff's Exhibit 140, however, plaintiff alleges that the price was $681,347.27. Plaintiff has never provided supporting information on how the price could reach $800,000. The court therefore concludes that plaintiff is arguing that the contract price was $681,347.27.

13. Tr. at 188; Defendant's Exhibit (Def.'s Ex.) 11 at 3.

14. The *Dictionary of Architecture and Construction* 113 (3d ed.2000) defines "borrow" as "Material taken from one location for use as fill elsewhere." "Fill" is defined as "Soil, crushed stone, or waste materials, used to raise an existing grade or as a man-made deposit." *Id.* at 366.

almost $20—I think 19.75 [per cubic yard].[15]

Plaintiff then performed the borrow work before an agreed price was reached:

> I didn't know what they were going to pay when they issued the unilateral. I just told them I'd go ahead and [d]o the work, so that we could try to get done before we got rained out. And in that interim, though, when we went to the borrow sites that they designated, we hit solid rock, and so we weren't able to get enough material. And they kept jumping us around to new sites. And it's the delay time in getting to the new sites. We spent more time looking for sites to dig out material than we did digging.[16]

The parties could not agree on a price for the borrow, so the CO unilaterally gave plaintiff $7.21 per cubic yard.[17] Plaintiff contends the contract price should be increased by $53,721.36 to reflect a per cubic yard price of $19.75 for the borrow, as plaintiff had originally requested.

Plaintiff again has not provided any actual proof of how the CO's decision to award $7.21 per cubic yard was unreasonable and not a fair price. *See McDonnell Douglas Corp.,* 50 Fed.Cl. at 318. Plaintiff also has not established how it's price of $19.75, which is more than twice as much as the CO allowed, is a more reasonable price. Plaintiff only offers the self-serving testimony of Mr. Clevenger to assert this claim. The court therefore concludes that the contract price should not be increased to further compensate plaintiff for the borrow.

Plaintiff also argues that the contract price should be raised to provide for equipment that was made idle during the winter before completing the borrow work. Plaintiff explains in Plaintiff's Exhibit 140:

> Due to delays related to the borrow the Contractor was not able to complete a large amount of the borrow work in the Fall of 1988. The winter shut down occurred on November 4, 1988 and work did not resume until May 10, 1989. This period is approximately 6 months. The contractor had to de-mobilize and re-mobilize equipment back to the job in the spring that he would finished [sic] using in 1988 had it not been for the delay caused by the borrow.[18]

Plaintiff claims these equipment costs totaled $44,509.44 based on the Army Corp of Engineer (ACE) standard rates. Plaintiff also asks the court to raise the contract price by $1,802.63 for the increased costs of paving caused by the delay in the borrow work and by $2,000 for the costs to re-mobilize after the winter to complete the borrow work.

Plaintiff's argument is unpersuasive. Plaintiff asks for compensation for these expenses in its claims discussed below for pre-termination equipment and labor costs.[19] Plaintiff has not established why the contract price should be increased to reflect these particular equipment costs but not the others. The court concludes that none of the equipment costs should be considered for increasing the contract price. The court therefore rejects all of plaintiff's arguments displayed in Plaintiff's Exhibit 140 for increasing the contract price. The final price was indeed $577,160.84. Plaintiff's termination for convenience award, exclusive of costs related to settlement, is limited by this amount.

When determining the cap set by the contract price for all costs unrelated to settlement, the court must reduce the $577,160.84 to reflect the amount of payments defendant previously made to plaintiff. 48 C.F.R. § 49.207; 48 C.F.R. § 52.249–2(f). Prior to the termination for default, defendant paid plaintiff $353,299.44 for its work on the Contract.[20] When this amount is subtracted from the contract price of $577,160.84, plaintiff is left with a damages cap of $223,861.40 for the remainder of its pre-termination ex-

---

15. Tr. at 52.

16. Tr. at 189–190.

17. Tr. at 220; Pl.'s Ex. 140.

18. Pl.'s Ex. 140.

19. Tr. at 223.

20. Def.'s Ex. 39 at 3; Defendant's Post–Trial Brief at 10.

penses and post-termination costs unrelated to settlement.

## II. Amounts Plaintiff Seeks

The CO unilaterally determined on October 7, 1997, that plaintiff was entitled to receive only $135,776. Plaintiff had proposed a much higher number during the prior settlement proceedings. Plaintiff filed the present claim to recover an amount in addition to the $135,776 it believes it has already been awarded.[21] At trial plaintiff's counsel expressed that plaintiff was seeking amounts "over the amount that the contracting officer allowed in the final decision." [22] Plaintiff's expectation that it will definitely receive $135,776, however, ignores the fact that "once an action is brought following a contracting officer's decision, the parties start in court ... with a clean slate." *Wilner v. United States*, 24 F.3d 1397, 1402 (Fed.Cir. 1994). Thus, the court will not automatically uphold the CO's calculation of plaintiff's entitlement. In this court an action challenging a CO's decision on a claim proceeds "de novo in accordance with the rules of the ... court." *Id.* at 1401 (citing 41 U.S.C. § 609(a)(3)). There is no presumption that any part of the CO's decision is correct. *Id.* (citing *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 23, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974)). Plaintiff bears the burden of proving termination for convenience damages. *Lisbon Contractors*, 828 F.2d at 767; *Bath Iron Works Corp.*, 34 Fed.Cl. at 231.

The court will therefore examine all of the CO's calculations for the disputed areas and not just the additional dollar amounts plaintiff requests. The court will nevertheless give some deference to the CO's determinations if the court believes they are reasonable. It is unnecessary, however, for the court to review the unchallenged amounts included in the CO's decision because the parties have agreed that plaintiff should receive them. The court will uphold these uncontested amounts and include them in its final calculations. They are noted below when applicable. The court will, however, review the challenged areas in which plaintiff seeks compensation. These areas include: (1) materials left on the performance site after termination; (2) pre-termination unpaid wages and equipment costs; (3) post-termination unpaid wages and equipment costs; and (4) post-termination G & A expenses.[23]

## III. Pre-termination Costs

### A. *Uncontested amounts*

Defendant does not challenge two of plaintiff's requested pre-termination expenses.[24] Defendant agrees that, in addition to the $41,484 the CO awarded for pre-termination G & A expenses, plaintiff is entitled to an additional amount of $9,124. This brings the total to $50,608. Defendant also agrees that the CO erred when she deducted from allowable costs $4,686. This amount arises from the CO's determination that plaintiff was allowed $419,383 for pre-termination revenue. The CO subtracted from this amount $424,069, which she believed to be the amount plaintiff had already received from defendant. The difference was $4,686 that the CO determined was an overpayment to plaintiff for pre-termination expenses. The CO therefore subtracted this amount from plaintiff's post-termination expenses.[25] The court agrees that this was an arbitrary deduction made by the CO. It is not, however, an amount that plaintiff is entitled to because the court is performing its own calculations on plaintiff's pre- and post-termination expenses. The court will not make the same mistake as the CO by taking this deduction. Since the court is reviewing the CO's calcula-

---

**21.** The CO testified at trial that plaintiff has already received defendant's payment of $135,776. Tr. at 510–11.

**22.** Tr. at 14–15.

**23.** Pl.'s Br. at 4. These characterizations are slightly different than what plaintiff had set forth prior to trial.

**24.** *See* Pl.'s Br. at 16–18; Defendant's Reply To Plaintiff's Post–Trial Brief (Def.'s Reply) at 3.

**25.** Pl.'s Ex. 8.

tions de novo, it is unnecessary to award plaintiff an additional $4,686.

The parties also do not challenge the CO's decision to award plaintiff: (1) $293,473 for Direct Job Costs and (2) $3,978 for the "Cost to Collect from J & C." Plaintiff did not address these costs in its complaint because it based its claim on the belief that the CO's decision would stand without review. Defendant refers to them in its briefs as if they were uncontested.[26] The court agrees that plaintiff should receive these amounts. The total for all uncontested pre-termination costs that the court will allow, therefore, is $348,059.

## B. *Equipment costs*

During the parties' termination for convenience settlement proceedings, plaintiff sought $570,882 for its construction equipment used on, or in standby at, the job site. Plaintiff based this amount on the standard rates for said equipment set forth in the Associated General Contractors of America, Inc. (AGC) Contractors Cost Guide, 1988 Edition. The CO, however, relied on the auditor's report and awarded plaintiff only $80,088. The auditors determined this was the appropriate amount per the actual cost data provided in plaintiff's accounting records. Plaintiff maintains the CO's determination was incorrect because the auditors only reviewed records for the equipment owned by White Buffalo and Rimrock and not the records for equipment the Clevengers personally owned. Plaintiff also asserts that the actual cost data in its accounting records did not reflect rental and repair expenses. Plaintiff argues that when no such data is available, the CO should look at the standard rates in the AGC Cost Guide to calculate the remaining costs. In addition, plaintiff challenges the auditors decision to not look at records prior to September 1988, when performance began. Plaintiff contends that the auditors should have included data from June–August 1988, because defendant awarded the Contract on June 1, 1988, the notice to proceed was issued on June 15,

1988, and the equipment was committed to the project at that time.

■ With respect to figuring equipment costs. FAR section 31.105(d)(2) provides, in pertinent part:

(i) Allowable ownership and operating costs shall be determined as follows:

(A) Actual cost data shall be used when such data can be determined for both ownership and operating costs for each piece of equipment, or groups of similar serial or series equipment, from the contractor's accounting records. When such costs cannot be so determined, the contracting agency may specify the use of a particular schedule of predetermined rates or any part thereof to determine ownership and operating costs of construction equipment . . . .

48 C.F.R. § 31.105(d)(2)(i)(A)(2001). The FAR therefore requires that the CO use actual cost data for determining equipment rates when available. Schedules of construction equipment use rates apply only in the absence of actual cost data. *Id.; Neal & Co., Inc. v. United States*, 17 Cl.Ct. 511, 518 (1989). It was proper for the CO to apply actual cost data in this case because it was provided in plaintiff's accounting records. The CO determined that this information established that plaintiff was entitled to $80,088. The court agrees that plaintiff should be awarded at least this much for pre-termination equipment costs.

1. Compensation for June 1988—August 1988

The court is concerned, however, that the auditors and CO only considered equipment costs occurring after September 1, 1988. Defendant awarded the Contract on June 1, 1988 and the notice to proceed was issued on June 15, 1988. The CO testified at trial that "[u]pon issuance of a notice to proceed, [the contractor is expected] to start work." [27] She also stated that she assumed plaintiff would start mobilizing for the work immediately after the contract award.[28] The court agrees with plaintiff, therefore, that the auditors and CO should also have considered

---

**26.** *See* Def.'s Reply at 9.

**27.** Tr. at 513.

**28.** *Id.*

June–August 1988 when calculating defendant's equipment costs.

It is unclear, however, which equipment was used during this time period. This makes it difficult for the court to calculate what additional amount should be awarded to plaintiff for these three months. Plaintiff has not provided this specific information. Michael Cruz, an auditor for DCAA, testified at trial that plaintiff also did not explain to him during the audit which equipment was used at what times during performance.[29] Mr. Cruz therefore chose to be generous, and he calculated actual equipment costs for all of White Buffalo's and Rimrock's equipment, regardless of whether it was actually used at all times.[30] Mr. Cruz looked at four different categories of actual cost data when figuring plaintiff's equipment costs: (1) depreciation; (2) repairs and maintenance; (3) operating costs; and (4) insurance.[31] Mr. Cruz calculated costs based on plaintiff's fiscal year beginning on the first day of April. Since Mr. Cruz explained in detail the mathematics behind his determinations, the court will follow his generous method and calculate these actual costs for all of the equipment owned by these two entities for June–August 1988.

For depreciation, Mr. Cruz first used $22,651, which was plaintiff's total depreciation for White Buffalo's equipment for the fiscal year beginning April 1, 1988. Mr. Cruz divided this number by twelve to calculate the amount of depreciation per month. The monthly rate equaled $1,888. Mr. Cruz then multiplied the monthly rate by 7 to determine the depreciation for September 1988—March 1989, which were the months he believed the equipment costs should be determined for the contract performance for this fiscal year. The court believes three additional months should have been included in Mr. Cruz's decision (June, July and August 1988). The monthly rate of $1,888 multiplied by 3 equals $5,664. Plaintiff should there-fore be awarded an additional $5,664 for the depreciation of the White Buffalo equipment.

As for the depreciation of the Rimrock equipment, $13,078 was the amount for the fiscal year beginning April 1, 1988. After dividing this number by 12, Mr. Cruz determined a monthly rate of $1,090. Multiplying the monthly rate by 3 yields a product of $3,270. The court concludes that plaintiff is entitled to $3,270 for the depreciation of the Rimrock equipment for June—August 1988. The total depreciation amount for both the White Buffalo and Rimrock equipment equals $8,934.

In regards to repair and maintenance costs, Mr. Cruz used the same method as depreciation—he found the yearly total and divided it by 12 to determine the monthly rate. He again did not consider amounts for June—August 1988. Mr. Cruz found a monthly rate of $280 for White Buffalo's equipment and $139 for Rimrock's equipment.[32] When multiplying these amounts by 3, the results are $840 and $417 respectively. The sum of these two amounts is $1,257. The court concludes that plaintiff is entitled to an additional $1,257 for repair and maintenance costs.

The operational costs Mr. Cruz considered included parts, fuel, lube, and all other items besides repairs and maintenance.[33] Mr. Cruz calculated a monthly rate of $794 for White Buffalo's equipment and $463 for Rimrock's equipment.[34] Multiplying these amounts by 3 yields products of $2,382 and $1,389. The sum of these two amounts is $3,771. Plaintiff is also entitled to this additional amount.

With respect to insurance, Mr. Cruz calculated a monthly rate of $1,500 for the White Buffalo equipment and $833 for the Rimrock equipment.[35] Multiplying these amounts by 3 provides totals of $4,500 and $2,499 respectively. The court believes plaintiff should also be awarded the sum of these two amounts, which is $6,999.

29.  Tr. at 421–22.

30.  *Id.*

31.  Tr. at 411;  Def.'s Ex. 35, Tab C.

32.  Def.'s Ex. 35, Tab C.

33.  Tr. at 419.

34.  Def.'s Ex. 35, Tab C.

35.  *Id.*

The court therefore concludes that plaintiff is entitled to an additional $20,961 for the White Buffalo and Rimrock equipment costs for June—August 1988. This amount is the sum of the above figures for depreciation, repairs and maintenance, operating costs and insurance.

### 2. Equipment owned personally by the Clevengers

The CO admitted at trial that she did not provide compensation for equipment owned personally by the Clevengers.[36] In addition, Mr. Cruz confirmed that he only reviewed the records for White Buffalo and Rimrock.[37] The calculations the court just performed are based solely on the equipment owned by these two entities. The court concludes that plaintiffs are entitled to some additional compensation for the use of the personally owned equipment. Mrs. Clevenger testified at trial that she does not own any equipment in her individual capacity, however, Mr. Clevenger does personally hold title to some machinery.[38]

Plaintiff has not provided actual cost data for the equipment personally owned by Mr. Clevenger. The FAR states that when actual cost data is not available, "the contracting agency may specify the use of a particular schedule of predetermined rates or any part thereof to determine ownership and operating costs of construction equipment" 48 C.F.R. § 31.105(d)(2)(i)(A). According to the Contract, ACE rates are to be applied when actual cost data is unavailable.[39]

Plaintiff has provided the court with Plaintiff's Exhibit 142, which details the ownership of each piece of equipment; and Plaintiff's Exhibit 123, which lists the ACE rates for each item. Plaintiff offers estimates in Exhibit 123 on how many months each piece of equipment was used and how many months it was idle. ACE rates are listed for both idle and "in use" periods. The court believes plaintiff should recover compensation for the periods the equipment was in use. Plaintiff should not, however, recover money for the time the equipment was idle. The court reaches this conclusion based on a comparison of the actual cost data provided for the equipment owned by White Buffalo and Rimrock and the ACE rates plaintiff lists for these items. The ACE rates are much higher than what actual cost data established. The court concludes that using only the "in use" rates will provide a reasonable amount of compensation for this equipment, similar to that owed for the White Buffalo and Rimrock machinery.

Based on Plaintiff's Exhibits 123 and 142, the equipment Mr. Clevenger personally owned, and the ACE rates for in use periods, are as follows:

| | | |
|---|---|---|
| 1. | Dresser TD20E Crawler Dozer: | $28,643.61 |
| 2. | JD 410 Backhoe Loader: | $ 5,838.75 |
| 3. | 1985 Ford F250 Diesel 4X4: | $ 8,650 |
| 4. | 1988 Ford F250 Diesel 4X4: | $ 5,406.25 |

There appears to be no ACE rates for two of the pieces of equipment owned personally by Mr. Clevenger. He testified at trial that there sometimes are not ACE rates for smaller equipment.[40] Since there are no ACE rates for these two items, the court concludes it is reasonable to use the AGC rates supplied by plaintiff:[41]

| | | |
|---|---|---|
| 1. | 1972 32 Ft Traveleze Travel Trailer: | $1,520 |
| 2. | 16' Office & Storage Trailer: | $1,160 |

The total amount for these six pieces of equipment owned personally by Mr. Clevenger is $51,218.61. Plaintiff is entitled to this amount.

### 3. Additional repair costs

Plaintiff also asserts that the actual cost data for its equipment does not reflect major repairs that were made after the termination that were necessitated by the contract work. Mr. Cruz admitted that his audit of plaintiff's accounts did not consider repairs occurring after the termination date.[42] After reviewing the information provided on plaintiff's ac-

---

36. Tr. at 528.

37. Tr. at 422.

38. Tr. at 325.

39. Pl.'s Ex. 1, Clause G2.7.

40. Tr. at 178.

41. These AGC rates are also provided in Pl.'s Ex. 123.

42. Tr. at 450.

counting system, the court finds plaintiff's argument that all repairs are not reflected in the actual cost data to be persuasive.[43] Plaintiff has not, however, provided specific information or even estimates on the costs of these later repairs. Plaintiff merely invokes the AGC or ACE standard rates encompassing all equipment costs. These rates are not itemized for specific areas such as repairs or depreciation. The court is left with no exact figures to determine compensation for these additional repairs.

■ The Federal Circuit recently reiterated that:

[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: "It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation."

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001) (citing *Elec. & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 257, 416 F.2d 1345 (1969) (quoting *Specialty Assembling & Packing Co. v. United States*, 174 Ct.Cl. 153, 184, 355 F.2d 554 (1966))). In certain instances this court has applied a "jury verdict" method "if there was clear proof of injury and there was no more reliable method for computing damages." *Id.* at 1357. "In estimating damages, the Court of [Federal] Claims occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties." *Id.* (quoting *Specialty Assembling*, 174 Ct.Cl. at 184, 355 F.2d 554 (citing *United States v. Smith*, 94 U.S. 214, 219, 12 Ct.Cl. 119, 24 L.Ed. 115 (1876))).

The court concludes, based on the jury verdict method, that $6,000 is fair compensation for any additional repairs occurring after termination that were necessitated by the contract work. The court determined this amount by taking the cost of repairs prior to termination, $4,329, and adding a reasonable allotment for repairs to the equipment owned personally by Mr. Clevenger. The court believes the cost of repairs prior to termination represents a fair amount for the cost of repairs after termination that were caused by the contract work. This conclusion is based on the reasonable notion that half of the repairs were completed prior to termination, and therefore were included in the actual cost data.

4. Rental costs

■ Plaintiff also contends that the actual cost data in its records does not reflect plaintiff's expenses for renting equipment from Rimrock and Mr. Clevenger. Plaintiff cites this as another reason why standard rates should be used for figuring the equipment costs. Plaintiff believes it is entitled to compensation for the rental costs of using Rimrock's and Mr. Clevenger's equipment.

Plaintiff used the accrual method of accounting, however, it never recorded rental rates as they accrued because "it would have turned us bottoms up. We would have had a negative net worth." [44] Plaintiff concedes it could have borrowed money to pay for the rental rates but chose not to do so because it "would have cost us." [45] Mr. Clevenger admitted at trial that plaintiff never actually figured monthly rental payments to Rimrock.[46] In fact, Mr. Clevenger testified that "rental" is not the right word for the use of this equipment. He stated:

Well, "rental" isn't the right word. All the equipment is owned by Julie and myself, in one way or the other. It's—some of it I

---

**43.** The court still believes that, overall, the actual cost data provided in plaintiff's records is sufficient to preclude using the standard rates for plaintiff's equipment claims, except for when determining the equipment costs for the items personally owned by Mr. Clevenger. The court merely concludes that plaintiff should receive additional compensation for later occurring repairs that are not reflected in this actual cost

data, which is limited to the fifteen-month period the auditor's reviewed.

**44.** Tr. at 311.

**45.** Tr. at 308.

**46.** Tr. at 233.

had bought personally, some of it White Buffalo purchased, some of it Rimrock purchased. And we just call ourself Julie and Luther. If I wanted an excavator, I took one of our excavators. I didn't go and say, "Julie, I need to take this excavator, and here's a check for a month's rent." I loaded her up and hauled her off. It wasn't a formal written agreement; it's just the way we did business.[47]

Mr. Clevenger also explained that plaintiff paid Rimrock "rent" when Rimrock needed to purchase a piece of equipment.[48] Plaintiff would then use this new equipment.[49] Plaintiff, therefore, was essentially paying rent to Rimrock for equipment Rimrock did not yet own. Rimrock would purchase the equipment using this "rental" payment and then plaintiff would use the new machinery. Mr. Clevenger also explained that rent was taken on an "as-needed basis, for payments or to buy it or for repairs."[50] The court does not believe that these arrangements constitute a rental relationship.

The court concludes that plaintiff, Rimrock, and the Clevengers, although different in name, essentially acted as the same entity for purposes of this Contract.[51] Mr. Clevenger is the owner of plaintiff. Mrs. Clevenger is the owner of Rimrock. Plaintiff not only used its own equipment for the Contract, it also freely used equipment owned by Rimrock and Mr. Clevenger. Plaintiff's claim for rental costs is unpersuasive.

The FAR does permit the recovery of rent between parties under common control to the extent that this rent represents the normal costs of ownership, such as depreciation, taxes, insurance, and maintenance. 48 C.F.R. § 31.205–36(b)(3) (2001); see also Neal & Co., Inc., 17 Cl.Ct. at 519. This rent cannot be recovered, however, if it duplicates any other allowed cost. 48 C.F.R. § 31.205–36(b)(3). The court interprets this provision to mean that if plaintiff has already received compensation for the normal costs of ownership for the "rented" equipment at issue, it

cannot also receive payment for renting this equipment if the parties are under common control. The court is allowing plaintiff to recover compensation for the costs of depreciation, repairs and maintenance, operating costs and insurance based on the actual cost data for not only White Buffalo's equipment, but also for Rimrock's equipment. The court is also using standard rates to allow compensation for the equipment owned personally by Mr. Clevenger. Plaintiff, Rimrock and the Clevengers are all under common control. The FAR prohibits them, therefore, from recovering costs for renting from each other the equipment at issue. If the court were to hold otherwise, plaintiff would be compensated twice for the same expenses.

In summary, plaintiff is entitled to a total of $158,267.61 for pre-termination equipment costs. This amount represents $80.088 for the equipment expenses based on actual cost data; $20,961 for additional equipment costs for the months June—August 1988; $51,218.61 for equipment owned personally by Mr. Clevenger; and $6,000 for repairs occurring after the termination date but necessitated by the contract work.

### C. Payroll

■ Plaintiff seeks $81,505 for the work performed on the Contract by its personnel, Mr. and Mrs. Clevenger. This amount includes unpaid payroll, overhead costs and taxes. The DCAA auditors characterized these services as an unsupported estimate of the time the Clevengers allocated to the Contract. The CO awarded nothing for this claim based on the auditors' report. Plaintiff maintains this report is advisory only, so the CO should have exercised her independent judgment on this issue. Plaintiff contends the CO failed to exercise this discretion when she awarded nothing for these services, because she disregarded her personal knowledge of plaintiff's pre-termination efforts on behalf of the Contract.

47. Tr. at 235–36.

48. Tr. at 231.

49. Id.

50. Tr. at 48.

51. An example of how they acted as the same entity is Mrs. Clevenger's admission that plaintiff paid Rimrock's insurance. Tr. at 333.

Plaintiff calculated the $81,505 based on an hourly wage of $36 for Mr. Clevenger and $15 for Mrs. Clevenger.[52] Plaintiff estimated the amount of hours it believed Mr. and Mrs. Clevenger worked on the Contract because they do not keep time cards. Said estimation was made years after the work was allegedly performed.[53] Plaintiff claims to have accrued these estimated wages in 1995, which is when it recorded them in its books.[54]

Although plaintiff is requesting wages for the Clevengers, it made very clear at trial that it has no system in place for providing them hourly wages. Instead, the Clevengers take "draws" of money from plaintiff when needed, if the money is available.[55] They take this money out of revenue the company generates. Mr. Clevenger admitted at trial that he and his wife did not receive a regular salary from plaintiff.[56] Mrs. Clevenger also conceded that the amount of money they withdrew for wages had no relationship to the work they performed for plaintiff.[57]

The auditors found plaintiff's claim to be unsupported because plaintiff provided no time cards or records indicating the amount of hours worked. Plaintiff has stated that it has computer records of the Clevengers' work, but it refused to provide these records to the auditors or defendant because they allegedly contain confidential information related to this litigation. Plaintiff only provided computation sheets depicting the methodology plaintiff followed when computing the $81,505. The court understands why plaintiff did not provide *un*redacted versions of these records to defendant. The court does not understand, however, why plaintiff did not offer redacted versions to substantiate their claim. Plaintiff alleges that defendant did not ask for redacted versions, but it is plaintiff's duty to prove these wages to defendant. The court is most concerned that plaintiff claims to have computer records of this work, but it did not proffer said evidence at trial

where it had the burden of proving that these wages were actually incurred. *Lisbon Contractors*, 828 F.2d at 767; *Bath Iron Works Corp.*, 34 Fed.Cl. at 231. Plaintiff has failed to meet this burden of proof. A mere estimation performed years later of hours believed to be worked, and a request for hourly wages made by a business that does not offer regular payroll to the Clevengers, is not enough to support plaintiff's payroll claim.[58]

The court could still award compensation for payroll, based on the jury verdict method described above, if it believed the Clevengers would not be fairly compensated for their work on the Contract. The court concludes, however, that the Clevengers will be adequately paid for their work based on the normal method in which they recover such compensation. As just stated, the Clevengers were not salaried employees of plaintiff and instead took money "when they needed it." Presumably, any money they took from plaintiff for work performed on the Contract came from its profits. When plaintiff bid on the Contract, it included "15–percent overhead and a 10–percent profit."[59] Plaintiff can still recover wages from its revenue because the parties have agreed that plaintiff is entitled to 10% profit on all amounts recovered from the court's decision. Plaintiff's request for pre-termination payroll, therefore, is denied. *See McCollum v. United States*, 6 Cl.Ct. 373, 379 (1984) ("because plaintiff, as owner, normally took the company profits as compensation and did not receive a salary, he was not entitled to any compensation for his time.") (citations omitted).

D. *Sum of pre-termination costs*

The court therefore concludes that plaintiff is entitled to the following pre-termination costs: (1) $293,473 for direct job costs; (2)

---

52. Tr. at 174.

53. Tr. at 310.

54. *Id.*

55. Tr. at 305.

56. Tr. at 229.

57. Tr. at 305.

58. The court's decision is reinforced by the fact that the Contract contained no line item specifically for employee wages. Pl.'s Ex. 1.

59. Tr. at 49.

$3,978 for the cost to collect from J & C; (3) $50,608 for G & A expenses; and (4) $158,267.61 for equipment costs. Plaintiff's request for pre-termination payroll is denied.[60] The total amount awarded for pre-termination costs is $506,326.61. This amount is subject to the limitation described above related to the contract price. Said limitation is calculated below in conjunction with the post-termination costs unrelated to settlement.

## IV. Post–Termination Costs Unrelated To Settlement [61]

The FAR states that reasonable costs *related* to settlement include:

(i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

(ii) The termination and settlement of subcontracts (excluding the amounts of such settlements); and

(iii) Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory.

48 C.F.R. 52.249–2(g)(3). The court concludes that the following post-termination expenses, as characterized by the parties, do not meet this definition and therefore are unrelated to settlement: (1) amounts earned but not paid (TIG expenses); (2) costs of the trip to meet TIG; (3) idle labor costs; (4) costs of materials left on site; (5) equipment costs; and (6) earned but unpaid payroll. These costs are subject to the limitation established by the contract price. All other post-termination costs are discussed separately below because the court considers them to be related to settlement.

### A. Uncontested amounts

Plaintiff requested $43,124 during settlement discussions to cover plaintiff's surety expenses owed to TIG. The CO only awarded plaintiff $11,500 for this purpose. Plaintiff now seeks the remaining $31,624. Defendant originally contested this claim because plaintiff had characterized it generically as TIG expenses. At trial, however, plaintiff explained that this money represents funds defendant never paid to plaintiff for its last progress payment. Plaintiff intended to use these funds to cover TIG's costs. In its post-trial reply brief defendant admits that it no longer challenges this request because it is for funds never paid to plaintiff for its last progress payment.[62] Defendant also does not contest the $11,500 the CO awarded. The parties therefore agree that plaintiff is entitled to a total of $43,124 for this expense.

In addition, the parties do not contest the CO's decision to pay plaintiff the following: (1) $1,483 for the costs of its trip to meet TIG and (2) $12,091 for idle labor costs. The total amount of uncontested post-termination costs unrelated to settlement, therefore, is $56,698.

### B. Materials left on site

■ Plaintiff originally requested $2,435 for materials it believes it was required to leave at the project site. At trial, plaintiff reduced this amount to $2,135 to correct a mathematical error.[63] The CO awarded nothing for these items because she claims she had asked plaintiff to remove them after termination. Plaintiff contends it never received notice to remove the materials.[64]

---

60. For the reasons discussed above, plaintiff also is not entitled to $4,686 for an arbitrary deduction made by the CO when calculating her award, because the court is performing its own separate analysis.

61. Plaintiff spent a lot of time at trial and in its briefs alleging that the CO refused to cooperate with plaintiff, thus exacerbating plaintiff's post-termination costs. Plaintiff, for example, asserts that the CO's actions increased plaintiff's equipment and payroll claims. After reviewing the evidence and the parties' testimony, however, the court believes that plaintiff's conduct was just as uncooperative as the CO's. Plaintiff's constant phone calls and correspondence to defendant quite possibly escalated the settlement situation to an impasse. The court therefore concludes that the CO's alleged lack of cooperation is irrelevant when determining plaintiff's entitlement to its alleged claims.

62. Def.'s Reply at 4.

63. Tr. at 160.

64. Plaintiff asserts in its post-trial brief that its claim for materials left on site is virtually uncontested. Pl.'s Br. at 16. Defendant disagrees and maintains that plaintiff is entitled to no compensation for this claim. Def.'s Reply at 3.

Plaintiff lists these items in Plaintiff's Exhibit 139, and Mr. Clevenger described them at trial as:

[M]y fuel tank and barricades and sign stands, some timber and some salvage, some miscellaneous materials that were used in the process of construction, but wouldn't have been incorporated into the project.[65]

The auditors actually approved this expense in their report,[66] but the CO, within her discretion, disagreed.

Defendant argues that plaintiff is not entitled to compensation for these materials because the CO instructed plaintiff to remove them. Defendant maintains plaintiff could have removed the items at the time it took photographs of the construction site shortly after the termination for default. Mr. Clevenger stated at trial that, even though he took photos of the construction site and could have removed the items, he did not because he feared criminal charges.[67] Defendant had hinted to plaintiff that it was considering a criminal investigation for damage done to the construction site.[68] The court finds it reasonable for plaintiff to have left the items at the site based on this threat.

Moreover, even though defendant claims it instructed plaintiff to remove the materials, the CO admitted at trial that she could not find documentation to prove such notice was sent to plaintiff.[69] Mr. Clevenger did admit at trial that he did not receive written instructions from defendant to *leave* these items at the job site.[70] The court is concerned, however, that there is no indication that defendant actually asked plaintiff to remove the items. After consideration of these circumstances and the parties' testimony, the court concludes that plaintiff is entitled to $2,135 for these materials.

C. *Equipment costs*

Plaintiff also submitted a request for $756,009 as fair compensation for idle equipment during the post-default termination through completion period—a time of 28 months. Plaintiff based this amount on the AGC Cost Guide, 1988 Edition. The DCAA auditors rejected the use of the AGC Cost Guide, and instead, used equipment costs recorded in plaintiff's books and Rimrock's books for the period beginning April 1990 and ending March 1992. The auditors did not consider equipment owned personally by Mr. Clevenger. Based on these amounts, the CO awarded plaintiff $56,630 for the idled equipment. Plaintiff now seeks $699,379.

The FAR does allow a contractor to recover post-termination equipment costs that accumulate as a result of the termination. 48 C.F.R. § 31.205–42 (2001). This court has held, however, that this recovery should be limited to a reasonable amount of time to remove the equipment from the job site. *Nolan Bros., Inc. v. United States*, 194 Ct.Cl. 1, 29, 437 F.2d 1371 (1971). These expenses must be calculated by using actual cost data, if available. 48 C.F.R. § 31.105(d)(2). The CO followed this requirement and awarded $56,630 based on the actual costs recorded in plaintiff's records.

Plaintiff raises the same arguments here as it did in reference to pre-termination equipment costs. Plaintiff maintains defendant failed to take into account equipment personally owned by Mr. Clevenger. It also argues that the actual cost data in its books does not reflect all of the expenses of the equipment. Plaintiff believes it should be paid for this equipment because it was made idle as a result of the termination for default.

The court questions plaintiff's claim that this equipment should be considered idle for the time it took J & C to complete the Contract. In fact, plaintiff commented at trial that the equipment was actually idle for seven years after the termination.[71] Yet, plaintiff also admitted that the equipment was rented out during the period between the

65. Tr. at 159.

66. Tr. at 430.

67. Tr. at 588.

68. *Id.*

69. Tr. at 536.

70. Tr. at 589.

71. Tr. at 141.

termination for default and the conversion to a termination for convenience.[72] Mr. Clevenger went through each piece of equipment in detail at trial and explained the rates for which it was rented.[73] It does not sound like the equipment was idle for this period of time.

Still, Mrs. Clevenger did testify that plaintiff lost its bonding capacity as a result of the termination and did not regain it until 1993 or 1994.[74] This loss of bonding hindered the amount of work plaintiff could perform.[75] Also, the auditors did find substantiation for actual post-termination costs related to the termination. The CO agreed with this part of the audit and awarded plaintiff $56,630.

The court, in its discretion, chooses to uphold the CO's determination in light of the fact that plaintiff's use of its equipment was hindered for some time as a result of the termination. The court also considers the *Nolan Bros., Inc.* case where the court awarded post-termination equipment costs for a reasonable period of time to remove the equipment. 194 Ct.Cl. at 29, 437 F.2d 1371. As discussed above in relation to pre-termination equipment costs, the court will, however, use the actual cost data in accordance with the FAR, as opposed to AGC or ACE rates as plaintiff proposes. This data reflects an amount of $56,630.

The court will also allow compensation for Mr. Clevenger's personally owned equipment, which defendant did not consider in its calculations. Although the amount seems excessive, the court will follow the proposed ACE rates for this equipment, when available:[76]

| | | |
|---|---|---|
| 1. | Dresser TD20E Crawler Dozer: | $44,012.80 |
| 2. | JD 410 Backhoe Loader: | $ 7,681.20 |
| 3. | 1985 Ford F250 Diesel 4X4: | $ 1,332.10 |
| 4. | 1988 Ford F250 Diesel 4X4: | $ 1,332.10 |

There again appears to be no ACE rates for two of the pieces of equipment owned personally by Mr. Clevenger. The court will

therefore apply the AGC rates supplied by plaintiff:[77]

| | | |
|---|---|---|
| 1. | 1972 32 Ft Traveleze Travel Trailer: | $2,800 |
| 2. | 16' Office & Storage Trailer: | $3,836 |

The total for these six pieces of equipment is $60,994.20. When added to the actual cost data for the equipment owned by White Buffalo and Rimrock, the total award for post-termination equipment costs is $117,624.20. The court believes this more than sufficiently compensates plaintiff for any expenses caused by equipment idled as a result of the termination for default.

### D. *Payroll*

Plaintiff also requests $284,520 for earned but unpaid payroll and related costs it incurred from the date of termination, November 24, 1989, to the date it submitted its settlement proposal, February 1, 1996, a 74–month period. The DCAA auditors characterized plaintiff's amount as an estimate of the time the Clevengers were assigned to the Contract. It only reviewed the unpaid post-termination wages from the date of termination to the date J & C completed the contract, a 28–month period. The CO awarded nothing for these costs.

Plaintiff's payroll claim is based on a $36 an hour rate for Mr. Clevenger and a $10 rate for Mrs. Clevenger.[78] Plaintiff asserts that Mr. Clevenger worked 6,035 hours post-termination and Mrs. Clevenger worked 2,385.[79] Plaintiff does not provide a detailed description of the type of work performed for which it is now claiming these wages. It appears a lot of the hours alleged for Mr. Clevenger were for time he spent acting as his own attorney in various claims against the replacement contractor and defendant in other causes of action.[80] Plaintiff also is asserting wages for Mr. Clevenger's "super-

---

72. Tr. at 607.

73. Tr. at 607–15.

74. Tr. at 312.

75. Tr. at 313.

76. Pl.'s Ex. 123.

77. These AGC rates are also listed in Pl.'s Ex. 123.

78. Pl.'s Ex. 138.

79. *Id.*

80. Tr. at 75, 181–82.

vision" of J & C in completing the work.[81] Mr. Clevenger testified at trial that he believed he had a continuing contract with the federal government for this project after the termination for default so it was his responsibility to monitor J & C.[82] Plaintiff's claims are completely unfounded.

It is well-established that without authorization, work performed after termination is not compensable. *Mega Constr. Co. v. United States*, 29 Fed.Cl. 396, 469 (1993); *Semco, Inc. v. United States*, 6 Cl.Ct. 81 (1984). After plaintiff was terminated for default, it had no contractual right to remain on the job site or complete the Contract. *Mega Constr. Co.*, 29 Fed.Cl. at 475. Defendant made clear in the termination for default notice issued November 24, 1989, that plaintiff was no longer authorized to perform any work related to the Contract.[83] Plaintiff's belief that it had a continuing contract with defendant was simply incorrect.

Moreover, plaintiff's commitment to supervise J & C so that plaintiff's and defendant's costs would be "minimized" in no way obligates the government to compensate plaintiff for this work.[84] Defendant never authorized plaintiff's involvement with J & C in any way.[85] Plaintiff states that its work with J & C included seeking it out and helping it prepare its entire bid package.[86] Plaintiff has no right to claim compensation for assisting in the completion of the Contract after it was specifically ordered to cease its involvement with the work.

In addition, plaintiff cannot claim compensation for work it performed acting as its own attorney in lawsuits with the replacement contractor or with defendant on other issues not before this court. For example,

plaintiff claims the proposed wages, in part, reflect the time Mr. Clevenger spent preparing an Equal Access to Justice Act (EAJA) application for attorney's fees for an action plaintiff brought challenging the termination for default.[87] This EAJA application was denied by the Department of Agriculture Board of Contract Appeals.[88] Plaintiff now expects to recover money from the court in this action for work Mr. Clevenger performed on an EAJA claim in another cause of action. Another example of Mr. Clevenger's attorney work for White Buffalo was a three-day jury hearing against J & C he claims to have participated in on behalf of White Buffalo.[89] The court believes defendant is not obligated to compensate plaintiff for attorney work performed in a cause of action in which it was not even a party. The court finds plaintiff's request for wages related to attorney work unpersuasive.

Plaintiff also has failed to provide documentation to substantiate its payroll claims. As the court discussed above in relation to pre-termination wages, plaintiff has computer records of the time it allegedly worked but has refused to give this information to defendant or the court. Plaintiff merely relies on estimates performed years later of what it believes were the hours that were worked. Since plaintiff's claims for post-termination wages are based on work unauthorized by defendant, and because they are for work in which defendant has no responsibility for providing compensation, the court denies plaintiff's claim *in toto*.[90]

E. *Sum of post-termination costs unrelated to settlement*

The court concludes that plaintiff is entitled to the following post-termination costs

---

81. Tr. at 75.

82. Tr. at 199.

83. Pl.'s Ex. 2.

84. Plaintiff's counsel stated at trial that Mr. Clevenger supervised J & C as a favor to defendant in order to minimize its costs. Tr. at 19. Plaintiff, however, has brought a claim for almost $2 million on a Contract that was worth only $577,160.84. As defendant's counsel expressed at trial, "where is the favor?" Tr. at 32.

85. Tr. at 199.

86. Tr. at 83–87.

87. Tr. at 263–64.

88. Tr. at 284.

89. Tr. at 182.

90. The court does feel plaintiff is entitled to a small amount of additional compensation for work related to preparing its settlement proposals, but the court considers this amount separately below in its discussion of post-termination G & A expenses.

unrelated to settlement: (1) $43,124 for the amounts earned but not paid (TIG expenses); (2) $1,483 for costs of the trip to meet TIG; (3) $12,091 for idle labor costs; (4) $2,135 for materials left on site; and (5) $117,624.20 for post-termination equipment costs. Plaintiff's request for post-termination payroll is denied. The total amount awarded for post-termination costs unrelated to settlement is $176,457.20.

## V. Calculation Of Total Award For Amounts Limited By Contract Price

As discussed above, the FAR mandates that all termination settlement awards, exclusive of costs related to settlement, are limited by the contract price less payments already received. 48 C.F.R. §§ 49.207; 52.249–2(f). The court has concluded that the contract price in this case is $577,160.84. Plaintiff has already received payments totaling $353,299.44. Thus, the contract price cap is $223,861.40.

The court concludes plaintiff is entitled to $506,326.61 for pre-termination costs and $176,457.20 for post-termination costs unrelated to settlement. The sum of these amounts is $682,783.81. This is clearly in excess of the $223,861.40 cap set by the contract price, even when amounts are subtracted to compensate for payments already received. Pursuant to the FAR, therefore, the court can only award plaintiff $223,861.40 for its pre-termination costs and post-termination costs unrelated to settlement.

## VI. Post–Termination Costs Related To Settlement

The FAR states that reasonable costs *related* to settlement include: (1) accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data; (2) the termination and settlement of subcontracts (excluding the amounts of such settlements); and (3) storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory. 48 C.F.R. 52.249–2(g)(3). The court concludes that the

following post-termination expenses, as characterized by the parties, meet this definition: (1) CPA attorney costs; (2) cost to prepare inventory method; (3) cost to prepare total cost method; (4) costs associated with audits; and (5) G & A expenses. These costs are not subject to the limitation set by the contract price.

The parties agree that plaintiff is entitled to: (1) $6,830 for CPA attorney costs; (2) $648 for costs to prepare the inventory method settlement proposal; (3) $3,403 for costs to prepare the total cost method settlement proposal; and (4) $6,322 for costs associated with audits. The total of these uncontested amounts is $17,203.

The only area of dispute for these expenses is plaintiff's claim for post-termination G & A expenses. Plaintiff initially requested $53,203 for this cost. The CO awarded only $41,555 based on amounts substantiated by the auditors.[91] Plaintiff sought the remaining $11,648 in its complaint before this court, but it later withdrew this request at trial. Plaintiff therefore asks the court to uphold the CO's award of $41,555. Defendant argues in its post-trial briefing that the CO erred in granting plaintiff any money for post-termination G & A costs because said expenses are generally not allowable.

This court has held that post-termination G & A expenses related to unabsorbed overhead are not compensable. *Nolan Bros., Inc.*, 194 Ct.Cl. at 35, 437 F.2d 1371; *see also Chamberlain Mfg. Corp.*, ASBCA No. 16,877, 73–2 B.C.A. ¶ 10,139, 1973 WL 1882 (June 22, 1973). Such expenses include costs related to the contractor's existence as an on-going organization. *Nolan Bros., Inc.*, 194 Ct.Cl. at 35, 437 F.2d 1371. Plaintiff can recover, however, G & A expenses that are incidental to settlement. *Id.* at 34, 437 F.2d 1371; *Baifield Indus., Div. Of A–T–O, Inc.*, ASBCA No. 20,006, 76–2 B.C.A. ¶ 12,096, 1976 WL 25427 (August 18, 1976); *Thiokol Chem. Corp.*, ASBCA No. 17,544, 76–1 B.C.A. ¶ 11,731, 1976 WL 2082 (January 29, 1976); *see also* 48 C.F.R. § 52.249–2(g).

Mr. Clevenger indicated at trial that plaintiff's alleged expenses were related to home

---

**91.** Tr. at 168.

office overhead.[92] Plaintiff has provided no testimony or evidence, however, explaining whether said expenses were incidental to settlement. Still, the court is inclined to believe that plaintiff's resources were used in preparing its settlement proposals for defendant, and in relation to the DCAA audits. The court chooses to consider these proposed expenses as related to settlement, and will therefore uphold the CO's award of $41,555 for this cost.[93] The court feels this amount more than adequately compensates plaintiff for this item.

In addition, the "reimbursement for salaries or other expenses of home-office personnel directly involved in the termination and settlement of the contract ... [can] be allowed" with respect to post-termination G & A expenses. *Nolan Bros., Inc.*, 194 Ct.Cl. at 35, 437 F.2d 1371. The court believes plaintiff is entitled to a small amount of compensation for the Clevengers' work in preparing the settlement proposals. Plaintiff has not provided specific information, however, on what hours were spent on these proposals. Since the court believes the award of $41,555 for G & A expenses is more than sufficient in light of plaintiff's failure to establish that all of its G & A claim was incidental to settlement, the court concludes that any compensation owed to plaintiff for post-termination wages is covered by this amount.[94]

The total amount for plaintiff's post-termination costs related to settlement is therefore $58,758. This total includes the uncontested amounts and the award for post-termination G & A expenses.

## VII. Final Calculations

The court concludes that defendant owes plaintiff $223,861.40 for pre-termination costs and post-termination costs unrelated to settlement. Plaintiff is entitled to $58,758 for post-termination expenses related to settlement. The sum of these amounts is $282,619.40.

The parties also agree that plaintiff is entitled to a 10% profit on all amounts determined by this court.[95] The FAR states, however, that the "[ ]CO shall allow profit on preparations made and work done by the contractor for the terminated portion of the contract but *not* on the settlement expenses." 48 C.F.R. § 49.202 (2001) (emphasis added). This seems to prohibit an award of a 10% profit on the $58,758 the court is awarding plaintiff for post-termination costs related to settlement. The court interprets this provision, however, as limited to the amounts determined by a CO. Since the court is reviewing plaintiff's case de novo, and because the court is performing its calculations independently from the CO's decision, the court concludes that it is not limited by this FAR provision.[96] Plaintiff shall receive a 10% profit on the full $282,619.40. This profit equals $28,261.94. The sum of these two amounts is $310,881.34.

The court therefore awards plaintiff an amount of $310,881.34. The CO testified at trial, however, that plaintiff has already received $135,776 from defendant based on her unilateral decision.[97] The court must credit defendant for this payment to avoid overcom-

---

92. Tr. at 206.

93. The court notes plaintiff's argument at trial challenging the CO's method of determining G & A expenses. Both plaintiff and the auditors offered amounts for the pre- and post-termination G & A expenses. The CO used plaintiff's proposal for pre-termination G & A expenses and the auditors' suggestion for post-termination G & A expenses because these were the lowest options. Tr. at 530. Plaintiff contested the CO's decision because her method for determining G & A expenses was inconsistent. The parties now agree that plaintiff is entitled to the auditors' suggestion for pre-termination G & A expenses, which is higher than what plaintiff proposed. Plaintiff also agrees in its post-trial briefing that the auditors' suggestion should be used for the post-

termination G & A expenses. The approaches, therefore, are now consistent. Plaintiff's challenge to the CO's inconsistent method is now moot.

94. The court emphasizes that the $3,403 plaintiff is receiving for the costs to prepare its *total cost method* settlement proposal includes compensation for the Clevengers' wages in preparing said proposal. Tr. at 156

95. Def.'s Reply at 3.

96. The court's decision is reinforced by the fact that the parties agree that plaintiff should receive a 10% profit on *all* amounts awarded.

97. Tr. at 510–511.

pensation.[98] The final amount owed to plaintiff, after making this deduction, is $175,105.34.

### Conclusion

For the above-stated reasons, the Clerk is directed to enter judgment in favor of plaintiff in the amount of $175,105.34, plus interest as specified in the Contracts Disputes Act, 41 U.S.C. § 611 (1987), commencing from February 1, 1996. In addition, if the parties are unable to settle the issue of attorney's fees, plaintiff may file, pursuant to the rules of this court, its petition for attorney's fees and costs under the EAJA, 20 U.S.C. § 2412. No costs.

IT IS SO ORDERED.

---

98. The court deducts this amount because it has reviewed plaintiff's claim independently of the

CO's decision, and not merely in addition to her award.